**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lighting Defense Group LLC,<br><br>Plaintiff,<br><br>v.<br><br>Shanghai Sansi Electronic Engineering Company Limited, et al.,<br><br>Defendants. | No. CV-22-01476-PHX-SMB<br>Consolidated with: CV-22-01671-PHX-SMB<br><br>**ORDER** |
| SANSI LED Lighting Inc., and SANSI Smart Lighting Inc.,<br><br>Plaintiffs/Counter-Defendants,<br><br>v.<br><br>Lighting Defense Group LLC,<br><br>Defendant/Counter-Plaintiff. | |

Pending before the Court is Defendants SANSI LED Lighting Incorporated, SANSI Smart Lighting Incorporated, Shanghai SANSI Electronic Engineering Company Limited's (collectively, "SANSI") Motion to Exclude the Testimony of Expert Thomas P. McGahee (Doc. 91). Plaintiff Lightning Defense Group LLC ("LDG") filed a response (Doc. 120), to which SANSI replied (Doc. 130). LDG requested oral argument (Doc. 120 at 1), which was scheduled for November 15, 2024, but the Court vacated oral argument, finding it unnecessary (Doc. 143). *See* LRCiv. 7.2(f). The Court will grant SANSI's

Motion for the following reasons.

## I. FACTUAL BACKGROUND

This Motion stems from LDG's allegations that SANSI infringed upon four of its patents (the "patents-in-suit") beginning in 2017. (Doc. 18.) The patents-in-suit relate to heat management technology for high efficiency lighting products, including those for light emitting diodes (also known as LEDs). (*Id.* at 2 ¶¶ 1–2.) The technology facilitates heat dispersion, resulting in LED products that are longer lasting, more efficient, and higher powered. (*Id.*) LDG alleges that SANSI made, imported, distributed, and sold infringing lighting products through its domestic affiliates, online, and through various retailers. (*Id.* at 7–14.) LDG seeks adequate compensation of at least a "reasonable royalty" under 35 U.S.C. § 284 for the alleged infringement. (*Id.* at 17–21.) LDG offers its damages expert Dr. Thomas P. McGahee's ("Dr. McGahee") opinion on how to calculate the reasonable royalty. Dr. McGahee opined that under a hypothetical negotiation, the parties would have agreed to running per-unit royalty license for the infringing products sold, imported, and inventoried during the period of infringement. (*Id.* at 25–58.)

SANSI now moves to exclude Dr. McGahee's expert testimony as untethered from the facts of this case, methodologically flawed, and unreliable. (Doc. 91.)

## II. LEGAL STANDARD

Federal Rules of Evidence 702 and 703, along with *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny, provide the legal framework for the admissibility of expert testimony.[1] *See Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online*, LLC, 792 F.3d 1339 (Fed. Cir. 2015). Rule 702 allows expert testimony if it is "more likely than not" that: (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (b) "the

---

[1] The Court's decision to admit expert testimony in a patent infringement case follows the law of the regional circuit. *GoDaddy.com LLC v. RPost Commc'ns Ltd.*, No. CV-14-00126-PHX-JAT, 2016 WL 2643003, at *2 (D. Ariz. May 10, 2016), *aff'd*, 685 F. App'x 992 (Fed. Cir. 2017) (citing *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390–91 (Fed. Cir. 2003)).

testimony is based upon sufficient facts or data;" (c) "the testimony is the product of reliable principles and methods"; and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Rule 703 states:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Under *Daubert*, the Court's focus "must be solely on principles and methodology, not on the conclusion that they generate." 509 U.S. at 595. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592.

The *Daubert* standard applies to not only "scientific" testimony but also expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–149 (1999). Admissibility is preconditioned on a valid connection to the pertinent inquiry. *Id.* at 149. Where an expert's "testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Id.* (alteration in original) (quoting *Daubert*, 509 U.S. at 592). The inquiry is a "flexible one." *Daubert*, 509 U.S. at 594; *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."). "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969–70 (9th Cir. 2013) ("The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury."). In this gatekeeping function, the Court's inquiry remains tied to the facts of a

particular case. *Kumho Tire*, 526 U.S. at 151 (citing *Daubert*, 509 U.S. at 591).

"Under these rules, a district court may exclude evidence that is based upon unreliable principles or methods, legally insufficient facts and data, or where the reasoning or methodology is not sufficiently tied to the facts of the case." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1295 (Fed. Cir. 2015); *see also Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 813 (9th Cir. 2014) ("[T]he trial court must assure that the expert testimony both rests on a reliable foundation and is relevant to the task at hand." (internal quotation marks omitted)); *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196–97 (9th Cir. 2014) ("Relevancy depends on the particular law at issue."); *Primiano*, 598 F.3d at 565 ("Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline."). The "sufficient facts or data" element under Rule 702 requires foundation, not corroboration, and "does not preclude an expert from making projections based on a reliable methodology." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1025 (9th Cir. 2022) (noting "a court may reject wholly speculative testimony and unfounded testimony," but errs "if it overlooks relevant data submitted as the foundation of an expert's remarks").

### III. DISCUSSION

#### A. Calculating Damages

Damages in patent infringement cases are limited to those "adequate to compensate for the infringement, but in no event less than a reasonable royalty." 35 U.S.C. § 284. For reasonable royalties, the damages must reflect "the use made of the invention by the infringer." *Id.* The aim of a reasonable royalty is to "compensate a patentee . . . for its lost opportunity to obtain a reasonable royalty that the infringer would have been willing to pay if it had been barred from infringing." *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334 (Fed. Cir. 2015). A reasonable royalty is "merely the floor below which damages shall not fall." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) (citation omitted). "Stated differently, a 'reasonable royalty is the amount that a person,

desiring to manufacture [, use, or] sell a patented article, as a business proposition, would be willing to pay as a royalty and yet be able to make[, use, or] sell the patented article, in the market, at a reasonable profit.'" *Looksmart Grp., Inc. v. Microsoft Corp.*, No. 17-CV-04709-JST, 2019 WL 4009263, at *2 (N.D. Cal. Aug. 5, 2019) (alterations in original) (quoting *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 771–72 (Fed. Cir. 2014)).

Patent litigants may use an "analytical method" to calculate reasonable royalties, which generally involves using an infringer's projected profits for the infringing product and apportioning that amount between the infringer and patentee. *Lucent*, 580 F.3d at 1324. But litigants more commonly use the hypothetical negotiation approach. *Id.*; *see also Cal. Inst. of Tech. v. Broadcom Ltd.*, 25 F.4th 976, 994 (Fed. Cir. 2022) (noting the inquiry assesses what the parties would have agreed to just before infringement began). The hypothetical negotiation approach evaluates what willing parties would have specified in a licensing agreement's royalty payment scheme, had the infringement not occurred. *Lucent*, 580 F.3d at 1325 (noting this assumes the asserted patent claims are valid and infringed). A reasonable royalty analysis involves a degree of hypothesizing but "must be based on 'sound economic and factual predicates.'" *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (citation omitted); *see also Alaska Rent-A-Car*, 738 F.3d at 968 (noting "[a]s in any damages case, the calculation ha[s] to address a hypothetical world that never existed"). The analysis necessarily involves an element of "'approximation and uncertainty,' and the ultimate royalty determination must reflect the two-sided nature of the posited negotiation." *Aqua Shield*, 774 F.3d at 771 (quoting *Lucent*, 580 F.3d at 1325). But this does not invite speculation, rather the damages inquiry focuses on the economic harm caused by the infringement. *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010).

Parties "frequently rely on comparable licensing agreements" to discern a reasonable royalty. *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1372 (Fed. Cir. 2020). "Assessing the comparability of licenses requires a consideration of whether

the license at issue involves comparable technology, is economically comparable, and arises under comparable circumstances as the hypothetical negotiation." *Id.* at 1372–73. The parties' use of the relevant technology after infringement is also a legitimate aid to discern a reasonable royalty. *Lucent*, 580 F.3d at 1333–34. Usage data, like sales projections or estimates as to the expected frequency of use, may provide information what the parties might have estimated in the hypothetical negotiation. *Id.* at 1334.

"A reasonable royalty may be a lump-sum payment not calculated on a per unit basis, but it may also be, and often is, a running payment that varies with the number of infringing units. A running royalty structure generally has two prongs: a royalty base and a royalty rate." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014); *see also Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1350 (Fed. Cir. 2000) (noting royalties are ordinarily computed based on sales of a patented product, but parties may choose other methods). The royalty base represents revenue generated by the infringement. *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 27 (Fed. Cir. 2012). The royalty rate represents the percentage of revenue owed to the patentee. *Id.* The amount payable under the typical running royalty licenses "is tied directly to the how often the licensed invention is later used or incorporated into products by the licensee." *Lucent*, 580 F.3d at 1326 (explaining this structure shifts the risks to the licensor because payments are tied to the magnitude of sales).

A lump-sum analysis involves different considerations. *Id.* (explaining lump-sum licenses benefit the licensor by enabling it to raise money quickly without needing to administratively track revenue numbers and benefits the licensee by capping its liability without further expenditure). Generally, this type of license obligates the licensee to pay the entire amount irrespective of whether the patented technology is commercially successful in use. *Id.* (noting, on the other hand, "the licensed technology may be widely successful, and the licensee may have acquired the technology for far less than what later proved to be its economic value"). Parties agreeing to a lump-sum royalty agreement may consider the expected or estimated usage of the to-be-licensed invention, assuming proof

is presented to support the expectation. *Id.* at 1327; *see also Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F3d 1371, 1384–85 (Fed. Cir. 2001) (accepting factual evidence of the patentee's business plan and projected sales prepared before infringement began).

Central to the hypothetical negotiation is the application of a fifteen-factor test set forth in *Georgia-Pacific Corp v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). *See Lucent*, 580 F.3d at 1324–25.[2] "[E]vidence purporting to apply to these, and any other factors, must be tied to the relevant facts and circumstances of the particular case at issue and the hypothetical negotiations that would have taken place in light of those facts and circumstances at the relevant time." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011). "If the patentee fails to tie the theory to the facts of the case, the testimony must be excluded." *Id.* at 1315.

**B. Dr. McGahee's Opinion**

Dr. McGahee's decision to use a running royalty structure to compute the reasonable royalty is the crux of the dispute. Dr. McGahee used the *Georgia-Pacific* factors to evaluate the "economic pressures" that would have been present during the hypothetical negotiation," which would "dictate the royalty payment structure." (Doc. 108 at 23.) For Factors 2–6, 8–10, and 13–15, Dr. McGahee either made no findings or found they were neutral with regards to the structure of the hypothetical negotiation. (*Id.* at 41–50, 53–56.)

---

[2] "These factors include: (1) royalties the patentee has received for licensing the patent to others; (2) rates paid by the licensee for the use of comparable patents; (3) the nature and scope of the license (exclusive or nonexclusive, restricted or nonrestricted by territory or product type); (4) any established policies or marketing programs by the licensor to maintain its patent monopoly by not licensing others to use the invention or granting licenses under special conditions to maintain the monopoly; (5) the commercial relationship between the licensor and licensee, such as whether they are competitors; (6) the effect of selling the patented specialty in promoting sales of other products of the licensee; (7) the duration of the patent and license term; (8) the established profitability of the product made under the patent, including its commercial success and current popularity; (9) the utility and advantages of the patent property over old modes or devices; (10) the nature of the patented invention and the benefits to those who have used the invention; (11) the extent to which the infringer has used the invention and the value of that use; (12) the portion of profit or of the selling price that may be customary in that particular business to allow for use of the invention or analogous inventions; (13) the portion of the realizable profit that should be credited to the invention as opposed to its non-patented elements; (14) the opinion testimony of qualified experts; and (15) the results of a hypothetical negotiation between the licensor and licensee." *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1240 n.3 (Fed. Cir. 2011) (citing *Georgia-Pacific*, 318 F. Supp. at 1120).

1 Under the remaining factors, LDG argues Dr. McGahee's findings supported or tended to
2 support using the running royalty structure. (*See id.* at 27–41, 45, 50–53.)

3 Under Factor 1, which evaluates the "royalties received by the patentee for the
4 licensing of the patent in suit, proving or tending to prove an established royalty,"
5 *Georgia-Pacific*, 318 F. Supp. at 1120, Dr. McGahee reviewed twenty-three of LDG's
6 licenses that included a license to the patents-in-suit. (*Id.* at 27.) He noted, "[a]mong these
7 23 patent license agreements, 7 agreements include representations as to the licensee's
8 revenues and/or unit sales associated with licensed products, allowing for the derivation of
9 an effective royalty rate either as a percentage of sales revenues or a per-unit rate," but not
10 the others, making them less informative. (*Id.*) Dr. McGahee then discussed the specifics
11 of those seven licenses, which he explained tended to show they were based, in part, on the
12 magnitude of sales and expected extent of use under the license. (*Id.* at 34–35.) He
13 expounded that the licenses covering a limited term and restrictions on sales channels,
14 particular licensed products, and brand names associated with selling licensed products
15 "suggest[ed] that the payments were based in part on the expected extent of the licensed
16 used." (*Id.* at 34–35.) Dr. McGahee also noted that he had a discussion with LDG's CEO,
17 Andrew Ramer, where Mr. Ramer explained LDG "considers sales information, the length
18 of the license, and the number of licensed products, among other factors, when negotiating
19 patent licenses agreements." (*Id.* at 30–31.) Based on this discussion and these restrictions
20 on use, Dr. McGahee opined that LDG would have sought a higher royalty rate from
21 licensees accounting for their economic circumstances. (*Id.* at 30–31, 34–35.)

22 Under Factor 7, which evaluates "[t]he duration of the patent and the term of the
23 license," *Georgia-Pacific*, 318 F. Supp. at 1120, Dr. McGahee stated:

24 
25 From an economic perspective, [patentee] reasonably would expect that
granting a license to the Patents-in-Suit with significant remaining useful life
would result in significant benefits to SANSI over a long period of time (i.e.,
26 up to 11.4 years). Similarly, SANSI would view obtaining licensing rights
to the Patents-in-Suit, which would enable it to compete more effectively in
27 the LED lighting source market, as providing significant value over this
28 lengthy license period. Under a running royalty payment structure, the

        lengthy duration of the license can be accounted for in the royalty base to which a running royalty rate will be applied (because the licensed sales will accrue over the life of the agreement).

(Doc. 108 at 45.) He then concluded "this *Georgia-Pacific* factor is supportive of a running royalty payment structure." (*Id.*)

        Under Factor 11, which evaluates "[t]he extent to which the infringer has made use of the invention; and any evidence probative of the value of that use," *Georgia-Pacific*, 318 F. Supp. at 1120, Dr. McGahee explained that since 2017, the LED market was experiencing and continuing to experience significant growth in the sales and share of the overall lighting market. (Doc 108 at 50.)[3] He then pointed to SANSI's sales data from 2017 through 2020, which indicated "significant sales and profits from the [infringing] [p]roducts." (*Id.* at 50–51.) Dr. McGahee concluded "[a]t the hypothetical negotiation, the parties would recognize that by agreeing to a running royalty payment structure, the royalty payments ultimately paid under the license would account for SANSI's actual extent of use of the patented technology," thus this factor supported a running royalty structure. (*Id.* at 51.)

        Under Factor 12, which evaluates "[t]he portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions," *Georgia-Pacific*, 318 F. Supp. at 1120, Dr. McGahee pointed to a "Signify licensing program," which involved Signify publicly offering licenses for its patent portfolio at royalty rates calculated by a percentage of net revenues. (Doc. 120-1 at 52–53.) Dr. McGahee concluded, although the Signify patents lacked technological comparability to the patents-in-suit, "from an economic perspective, the industry practice of offering a running royalty payment structure as evidenced by the Signify patent licensing program is supportive of my conclusion that [patentee] and SANSI would have negotiated a running royalty payment structure." (*Id.* at 53.)

---

[3] Earlier in his report, Dr. McGahee noted reports from the U.S. Department of Energy and an article that indicated sales of LED products were increasing overall and relative to other lighting products from 2015 to 2020. (*Id.* at 20–21.)

### C. The Parties' Arguments

At bottom, SANSI's *Daubert* challenge is that Dr. McGahee's opinion is untethered from the facts of this case, speculative, and flawed, therefore warranting exclusion. (Doc. 91 at 7, 17.) According to SANSI, Dr. McGahee cherry-picked seven licenses from a pool of twenty-three relevant lump-sum licenses based on the availability of sales and revenue data from those licenses, and his only reason for doing so was to facilitate reaching his predetermined conclusion that the parties would negotiate to a running royalty license. (*Id.* at 8–11.) SANSI argues that Dr. McGahee improperly relied non-comparable licenses from a "Signify licensing program" to ignore sixteen relevant lump-sum licenses and then reason that the "industry practice" is to offer a running royalty structure. (*Id.*) SANSI concludes this disregard of actual licensing evidence renders Dr. McGahee's opinion unreliable and violates Federal Circuit precedent. (*Id.* (citing *LaserDynamics*, 694 F.3d at 57–58, 77–81).) Compounding unreliability, SANSI further argues Dr. McGahee misconstrues Mr. Ramer's statements to reach the conclusion that the lump-sum amounts are based in part on magnitude of sales, which in turn informed his overall theory that a running royalty would apply. (*Id.* at 12–13.) In their view, Mr. Ramer's statement does not show that LDG definitively considers potential reaped royalties from future licensed sales. (*Id.*) SANSI also notes that Dr. McGahee failed to review negotiation correspondence, which tended to disprove his running royalty theory. (*Id.*)

In response, LDG accuses SANSI of mischaracterizing Dr. McGahee's report and argues his decision to pursue a running royalty is supported throughout his analysis of all *Georgia-Pacific* factors. (Doc. 120 at 6, 9–12, 16–17.) In doing so, LDG repeatedly characterizes SANSI's arguments as issues going to the weight of Dr. McGahee's opinions, not admissibility. (*Id.* at 6, 7, 15, 20 & n.6.) LDG contends that Dr. McGahee appropriately considered all twenty-three licenses but found those that lacked revenue or sales data rendered them less informative to the hypothetical negotiation inquiry. (*Id.* at 16–17.) According to LDG, this data enabled Dr. McGahee to adjust for the "relative extent of use," i.e., extent of sales. (*Id.*) LDG further notes Dr. McGahee's analysis of

1 Factors 1, 7, 11, and 12 support using a running royalty structure. (*Id.* at 10–11, 17.) LDG
2 disagrees with SANSI's characterization of the Signify licensing program, noting SANSI's
3 expert also opines on it, and argues it is relevant to prove an industry practice of using a
4 running royalty structure. (*Id.* at 17–18.) Finally, LDG responds that the negotiation
5 correspondence shows that a licensee offered a running royalty, which LDG considered in
6 granting the license. (*Id.* at 6, 7 n.3, 8, 10, 15 & n.6.)

7 In reply, SANSI criticizes LDG for failing to address the substance of their
8 arguments, reiterating that their *Daubert* challenge pertains to reliability, not credibility.
9 (Doc. 130 at 3.) SANSI again argues Dr. McGahee's *Georgia-Pacific* analysis does not
10 inform *why* he pursued the running royalty in the first place, therefore he failed to tie that
11 assumption to the facts of this case. (*Id.* at 3–7.) As to Factors 1, 7, and 11, SANSI argues
12 Dr. McGahee's reasoning is void of meaningful analysis on the *why* and artificially
13 buttresses his preconceived conclusion. (*Id.*) SANSI notes that Factor 12, in which Dr.
14 McGahee addressed the Signify licensing program, is LDG's only evidence that implies
15 anyone uses a running royalty in this industry. (*Id.*) But even then, Dr. McGahee failed to
16 provide the necessary link between that program and the parties' hypothetical negotiation,
17 and in fact, Dr. McGahee fatally opined that the two were not "technologically
18 comparable." (*Id.*)

19 To LDG's point that Dr. McGahee considered all twenty-three licenses, SANSI
20 replies that "mere reference to the fact that there were 23 licenses in the record does not
21 amount to consideration of all of those licenses." (*Id.* at 7–8.) SANSI contends that the
22 only consideration given to the other licenses was that they were "less informative" because
23 they lacked the data that would allow Dr. McGahee to derive a running royalty rate. (*Id.*)
24 SANSI reiterates that under *LaserDynamics*, such strained and selective reasoning to
25 exclude licenses probative to the structure of the hypothetical negotiation renders the entire
26 opinion unreliable. (*Id.* at 9.) SANSI further argues Dr. McGahee baselessly converted
27 the seven lump-sum licenses, and Mr. Ramer's statements, the negotiation correspondence,
28 and restrictions in the license do not support using a running royalty. (*Id.* at 10–13.)

- 11 -

**D. Analysis**

Dr. McGahee's opinion is unreliable. Here's why. "Beginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion." *Uniloc*, 632 F.3d at 1317.

The hypothetical negotiation inquires "into what the parties would have anticipated, looking forward when negotiating," it is not a "backward-looking inquiry into what turned out to have happened." *Aqua Shield*, 774 F.3d at 772. True, the hypothetical negotiation involves a degree of hypothesizing and uncertainty, but it "must be based on 'sound economic and factual predicates.'" *LaserDynamics*, 694 F.3d at 67 (citation omitted); *Lucent*, 580 F.3d at 1325. Under the *Georgia-Pacific* analysis, "past and present licenses to the actual patent and the actual claims in litigation" are relevant. *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010). "Assessing the comparability of licenses requires a consideration of whether the license at issue involves comparable technology, is economically comparable, and arises under comparable circumstances as the hypothetical negotiation." *Bio-Rad*, 967 F.3d at 1372–73. There is no dispute that the Federal Circuit has not recognized a categorical bar on obtaining damages in the form of a running royalty where there is a history of lump-sum licenses. *LaserDynamics*, 694 F.3d at 81. In fact, "[f]ull consideration of all the *Georgia-Pacific* factors might well justify a departure from the amount or even the form of [pantentee's] past licensing practices, given the appropriate evidence and reasoning." *Id.*

At the outset, the parties' arguments pose a unique hypothetical negotiation posture. Their dispute does not address the licenses that patents-in-suits' previous owner executed prior to SANSI's infringement, and instead address subsequent licenses LDG executed after infringement began under the hypothetical negotiation. *See, e.g.*, *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1257 (Fed. Cir. 2005) (noting, although the hypothetical negotiation generally pertains to events at the time of and preceding infringement, "not[hing] automatically exclud[es] evidence of subsequent events); *cf. Odetics, Inc. v.*

*Storage Tech. Corp.*, 185 F.3d 1259, 1276–77 (Fed. Cir. 1999) (holding exclusion of licenses executed after the onset of infringement as irrelevant was not improper).

Dr. McGahee failed to base his opinion on the running royalty structure on appropriate evidence and reasoning, which infected his entire opinion permeating it with unreliability. It is undisputed that all twenty-three licenses involve lump-sum payments and are actual licenses involving the patents-in-suit. Regarding form of the royalty structure, all twenty-three are certainly probative of what a hypothetical negotiation would have rendered for the structure. *See id.* at 79–80 ("Actual licenses to the patents-in-suit are probative not only of the proper amount of a reasonable royalty, but also of the proper form of the royalty structure."). Dr. McGahee opined that the sixteen licenses lacking sales and revenue data "ma[de] those agreements less informative for the determination of a reasonable royalty." (Doc. 120-1 at 27.) But this consideration evidently pertains to the amount of the royalty without consideration afforded to the structure.

Dr. McGahee's subsequent analysis of licenses, now culled to the seven, illuminates the inconsistencies in his selective reasoning. He opined that the availability of the sales data made it "reasonable to conclude" that the amounts paid for the seven licenses reflect, in part, the magnitude of sales. This is simply a circular conclusion couched as an analysis of fact. *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). Based on his limited reasoning, if the availability of data indicates that the license was negotiated based on magnitude of sales, the inverse should also hold true. But Dr. McGahee does not go as far to suggest the unavailability of data is indicative that those licenses were not based on magnitude of sales. Dr. McGahee even acknowledges that sales data may be available from third-party vendors, suggesting he premises his conclusions on incomplete data. (Doc. 120-1 at 27 n.92.) Further, the data he used relates to a licensee's past sales, not anticipated future sales. From the view of the hypothetical negotiation, using SANSI's infringing sales invites backward-looking justifications that allow LDG to capitalize on

SANSI's successes using an after-the-fact running royalty when the evidence overwhelmingly shows LDG's risk adverse preference for lump-sum licenses.

Dr. McGahee also points to the seven licenses providing for a limited term, restrictions on where a licensee could sell its products, restrictions on the particular licensed products, and restrictions on branding "suggest" the agreements are based, in part, on expected extent of use. This conclusion, however, is disconnected from the reality of this case. Had Dr. McGahee not whittled down the licenses, his analysis of these facts would have highlighted that all twenty-three licenses include restrictions on the affiliated brand names, sales channels, and licensed products. (*See* Doc. 120-1 at 201–07.) Additionally, ten of the ignored licenses provide for a limited term. (*Id.*) This is to say, the basis for reaching the conclusion that extent of use suggests the form of the licenses to justify a running royalty is necessarily true of nearly all, if not all, of the licenses. In other words, to the extent Dr. McGahee predicates his analysis on the availability of these terms to justify a running royalty, his reasoning is selective and suspect. *See LaserDynamics*, 694 F.3d at 81 (finding selective reasoning unreliable).

Dr. McGahee's reliance on Mr. Ramer's statements is also unavailing. Regardless of whether LDG considers sales information, length of the license, and number of licensed products in negotiating licenses, all twenty-three licenses at issue were executed as lump-sum agreements. Further, Mr. Ramer's statements provide no probative value to ascertain *how* LDG prophesizes those lump sums to reflect a running royalty, when it is uniquely in position to reveal such a practice. LDG's arguments about the other negotiation correspondence suffers a similar flaw. First, Dr. McGahee did not rely on the emails to conclude a running royalty structure would apply. Second, those emails show that in negotiating a license, Mr. Ramer indicated that "the only way" that LDG would "consider" a running royalty was if the prospective licensee paid an up-front lump-sum payment, of which LDG would credit past and future sales against with assurances the licensee would meet a minimum. (Doc. 120-1 at 68–69.) That is not the running royalty structure Dr. McGahee predicates his opinion on— it is fundamentally inconsistent with the risk profiles

1  inherent in running royalty agreement. *See Lucent*, 580 F.3d at 1326. Put simply, Mr. Ramer's statements and the emails do not any establish factual basis to conclude the hypothetical negotiation would take on a running royalty structure.

Regarding the Signify licensing program, Dr. McGahee failed provide any conceivable link of an industry practice of offering running royalty licenses that applies to LDG. *See Uniloc*, 632 F.3d at 1318. Instead, Dr. McGahee recites running royalty figures that he opined supported his theory "from an economic perspective." He does not explain what that perspective is or how that would induce the hypothetical negotiation to take on a running royalty structure that is contrary to LDG's historical practices. *See Joiner*, 522 U.S. at 146. Such a proposition would be wholly inconsistent with the evidence in this case. Further, Dr. McGahee's analysis of this evidence pertains to Factor 12, addressing "customary" rates charged in the "industry." *Georgia-Pacific*, 318 F. Supp. at 1120. Dr. McGahee essentially uses the Signify licensing program as if it were a comparable license to opine industry practice suggests a running royalty structure. The Court is cognizant degree of comparability is a factual issue for the jury. *ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*, 694 F.3d 1312, 1333 (Fed.Cir.2012). However, "the Federal Circuit's well-established precedent require[es] some degree of comparability between licenses used in the *Georgia-Pacific* analysis for the jury to weigh." *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1015–16 (N.D. Cal. 2013). Dr. McGahee conceded there was no technological comparability and made no effort to establish link addressing economic comparability between the program and the parties. *See Uniloc*, 632 F.3d at 1319 (explaining use of the *Georgia-Pacific* factors requires showing how the factors would impact the hypothetical negotiation in light of the relevant facts and circumstances of the case). Therefore, his opinion on the Signify licensing program is untethered from the facts of the case and speculative.[4]

---

[4] LDG also attempts to justify Dr. McGahee's reliance on the Signify licensing program to discuss an industry practice by noting that both parties' experts address the program. (Doc. 120 at 17–18.) However, SANSI's expert opined that the Signify licensing program *was not economically nor technologically sufficiently comparable* to inform the structure or amount of a reasonable royalty. (Doc. 126-1 at 252–55.) Further, SANSI's expert noted the licenses in that program were considerably broader, covering comprehensive portfolio

- 15 -

1  Additionally, Dr. McGahee's opinion that market trends would lead LDG to
2  anticipate SANSI's significant sales and profits, thus inducing LDG to seek an increased
3  royalty suffers the same flaw as his opinion on the seven licenses containing limited terms
4  and restrictions.  He provides no consideration to the fact that all twenty-three licenses
5  became effective around the period of this purported boom.  Yet not a single one takes on
6  a running royalty form.  Again, Dr. McGahee bases his conclusion that the parties would
7  negotiate running royalty structure, in part, on a basis that is necessarily true of nearly all
8  twenty-three of LDG's licenses, including those he did not consider under this factor.
9  Therefore, his reasoning is selective and suspect.  *See LaserDynamics*, 694 F.3d at 81
10 (upholding exclusion of expert testimony where the expert opined that market trends
11 justified a running royalty and excluded other relevant lump-sum licenses despite those
12 licenses being entered into when the value of the technology was increasing).

13 For these reasons, Dr. McGahee relies on strained reasoning to deduce a royalty rate
14 applicable to all of SANSI's infringing sales that replicates the damages LDG would have
15 sustained had it executed running royalty license.  Missing from the opinion is any indicia
16 beyond speculation that the parties would agree to per-unit running royalty license at a
17 hypothetical negotiation.  Therefore, Dr. McGahee's opinion is based on unsound factual
18 predicates, untethered from the facts of this case, and therefore unreliable as a whole.
19 *LaserDynamics*, 694 F.3d at 81.

20 ///
21 ///
22 ///
23 ///
24 ///
25 ///

---

of patented invention, and put Signify in a stronger bargaining position.  (*Id.*)  Despite Dr. McGahee regurgitating patent and royalty figures, this type of economic analysis is entirely absent from his and renders it unreliable.  *See, e.g.*, *TV Interactive Data*, 929 F. Supp. 2d at 1016 & n.4 (rejecting a party's argument that the court should allow its expert to opine on that licenses support his royalty rate where the other party's expert found the licenses noncomparable and neutral).

IV. **CONCLUSION**

Accordingly,

**IT IS ORDERED granting** Defendants' Motion to Exclude the Testimony of Expert Thomas P. McGahee (Doc. 91).

Dated this 20th day of November, 2024.

Honorable Susan M. Brnovich
United States District Judge