1    **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9    Lighting Defense Group LLC,              No. CV-22-01476-PHX-SMB
                                               Consolidated  with:  CV-22-01671-PHX-
10                    Plaintiff,               SMB

11   v.                                        **ORDER**

12   Shanghai  Sansi  Electronic  Engineering
     Company Limited, et al.,
13
                      Defendants.
14   ───────────────────────────────────
     SANSI  LED  Lighting  Inc.,  and  SANSI
15   Smart Lighting Inc.,

16                    Plaintiffs/Counter-
                      Defendants,
17
     v.
18
     Lighting Defense Group LLC,
19
                      Defendant/Counter-
20                    Plaintiff.

21

22          There are two Motions pending before the Court: Plaintiff Lighting Defense Group

23   LLC's ("LDG") Motion for Partial Summary Judgment (Docs. 98, 107 (sealed version))

24   and required Statement of Facts (Docs. 99, 90 (sealed version)) and Defendants' SANSI

25   LED Lighting Inc., SANSI Smart Lighting Inc., Shanghai SANSI Electronic Engineering

26   Company Limited's (collectively, "SANSI") Motion for Summary Judgment (Docs. 92,

27   109 (sealed version)) and required Statement of Facts (Docs. 93, 110 (sealed version)).

28   Both  Motions  are  fully  briefed.    (*See* Docs.  111  &  112  (SANSI's  Response  and

1    Controverting Statement of Facts), 124 & 125 (sealed versions); Docs. 121 & 122 (LDG's

2    Response and Controverting Statement of Facts), 127 & 128 (sealed versions); Docs. 131

3    (SANSI's Reply), 138 (sealed version); Docs. 140 (LDG's Reply), 139 (sealed version).)

4    The Court has considered the parties' briefings and the applicable law.  For the following

5    reasons, the Court will grant LDG's Motion in part, deny it in part, and grant SANSI's

6    Motion in part, and deny it in part.

7    **I.      FACTUAL BACKGROUND**

8          This case stems from LDG's allegations that SANSI infringed on U.S. Patent Nos.

9    8,256,923 (the "'923 Patent"), 9,163,807 (the "'807 Patent"), 7,874,700 (the "'700

10   Patent"), and 8,939,608 (the "'608 Patent") (collectively, the "Asserted Patents").  (Doc.

11   18.)  LDG's patent portfolio encompasses heat management technology for high efficiency

12   lighting products, including those for light emitting diodes (also known as LEDs).  (*Id.* at 2

13   ¶¶ 1–2.)  The technology facilitates heat dispersion, resulting in LED products that are

14   longer lasting, more efficient, and higher powered.  (*Id.*)  The Asserted Patents share a

15   common title—"Heat Management for a Light Fixture with an Adjustable Optical

16   Distribution." (Docs. 90-2 to 90-5.)  The Asserted Patents generally encompass apparatus

17   claims for a mountable LED light fixture. (*See* Doc. 68 at 11.)  The Court previously

18   construed "light fixture" to mean "a system for producing, controlling, and/or distributing

19   light for illumination." (*See* Doc. 68 at 4.)  The light fixtures also include a member, which

20   is configured to have LEDs on the outer surface, and a channel within the member

21   extending between the ends to transfer heat generated by the LEDs.  (*See, e.g.*, Doc. 90-2

22   at 2.)  The Asserted Patents are "directed to systems for adjusting optical distribution of a

23   light fixture." (*Id.* at 9.)  LDG does not manufacture or sell products using the patented

24   technology, instead it licenses the Asserted Patents to third parties.

25         SANSI designs and sells various LED lighting products in stores and in online

26   marketplaces. (Doc. 18 at 6–7.)  LDG alleges that SANSI made, imported, distributed, and

27   sold lighting products through its domestic affiliates, online, and through various retailers

28   that infringed on the Asserted Patents.  (*Id.* at 7–14.)  LDG seeks adequate compensation

1    of at least a "reasonable royalty" under 35 U.S.C. § 284 for the alleged infringement.  (*Id.*

2    at 17–21.)  Both parties now move for summary judgment on varying and overlapping

3    claims and defenses addressed in turn.

4    **II.    LEGAL STANDARD**

5           Summary judgment is appropriate in circumstances where "there is no genuine

6    dispute as to any material fact and the movant is entitled to judgment as a matter of law."

7    Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of a case under

8    the applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

9    Factual disputes are genuine when the evidence could allow a reasonable jury to find in

10   favor of the nonmoving party.  *Id.*  "A party asserting that a fact cannot be or is genuinely

11   disputed must support the assertion by . . . citing to particular parts of materials in the

12   record" or by "showing that an adverse party cannot produce admissible evidence to

13   support the fact."  Fed. R. Civ. P. 56(c)(1)(A)–(B).  Additionally, the Court may enter

14   summary judgment "against a party who fails to make a showing sufficient to establish the

15   existence of an element essential to that party's case, and on which that party will bear the

16   burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Accordingly,

17   the Court views "the evidence presented through the prism of the substantive evidentiary

18   burden" that applies at trial.  *Anderson*, 477 U.S. at 254.

19          When considering a motion for summary judgment, a court must view the evidence

20   in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v.

21   Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The Court must draw all reasonable

22   inferences in the nonmovant's favor.  *Anderson*, 477 U.S. at 255.  Additionally, the Court

23   does not make credibility determinations or weigh the evidence.  *Id.* at 253.  The

24   determination of whether a given factual dispute requires submission to a jury is guided by

25   the substantive evidentiary standards that apply to the case.  *Id.* at 255.

26          The burden initially falls with the movant to demonstrate the basis for a motion for

27   summary judgment, and "identifying those portions of [the record] which it believes

28   demonstrate the absence of a genuine issue of material fact."  *Celotex Corp.*, 477 U.S.

at 323.  If this initial burden is not met, the nonmovant does not need to produce anything even if it would have the ultimate burden of persuasion at trial.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).  However, if the initial burden is met by the movant, then the nonmovant has a burden to establish that there is a genuine issue of material fact.  *Id.* at 1103.  The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Zenith Radio Corp.*, 475 U.S. at 586.  Bare assertions alone do not create a material issue of fact, and "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 247–50 (citations omitted).

## III.    DISCUSSION

The main points of contention in the parties' Motions are as follows.  LDG moves for partial summary judgment, asking this Court to find that (1) SANSI's 35 U.S.C. § 112 invalidity defenses fail; (2) 35 U.S.C. § 287 does not preclude damages prior to May 25, 2020 or after June 26, 2020; and (3) SANSI's asserted non-infringing alternatives lack evidentiary support and do not limit potential damages.  (Doc. 107 at 7.)  SANSI moves for summary judgment that (1) various claims in the Asserted Patents are invalid as anticipated by prior art; (2) LDG failed to ensure its licensees marked products precluding pre-notice damages under § 287(a); and (3) LDG is not entitled to damages for periods prior to providing actual notice to SANSI of the alleged infringement for specific products.  (Doc. 109 at 2.)

### A. Invalidity

SANSI's invalidity defenses of the Asserted Patents include: (1) lack of written description; (2) lack of enablement; (3) indefiniteness; and (4) anticipation.  Under 35 U.S.C. § 282, a patent is presumed valid.[1]  "[A] moving party seeking to have a patent held not invalid at summary judgment must show that the nonmoving party, who bears the

---

[1]  The Leahly-Smith America Invents Act ("AIA"), 112 Pub. L. No. 29, § 4, 124 Stat. 284, 296 (Sept. 16, 2011), effective September 16, 2012, amended § 112 to designate previous subsections identified as paragraphs 1 through 6 as subsections (a) through (f).  The parties do not dispute that the Asserted Patents have the earliest possible priority date of September 19, 2007.  (Doc. 110 at 2 ¶ 1; Doc. 128 at 2 ¶ 1.)  For purposes of this Order, all references herein relate to the pre-AIA statutes.

burden of proof at trial, failed to produce clear and convincing evidence on an essential element of a defense upon which a reasonable jury could invalidate the patent." *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001). However, the party asserting anticipation to challenge the validity of a claim bears the burden of proof by clear and convincing evidence. *Innovative Scuba Concepts, Inc. v. Feder Industries, Inc.*, 26 F.3d 1112, 1115 (Fed. Cir. 1994). The Court addresses each of these issues in turn.

### 1. Written Description

Section 112, ¶ 1 mandates two distinct requirements: a "written description" and "enablement." *See Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1307–08 (Fed. Cir. 2015). Whether a patent claim satisfies the written description is a question of fact. *Purdue Pharma L.P. v. Collegium Pharm., Inc.*, 86 F.4th 1338, 1345 (Fed. Cir. 2023). To overcome the presumption a patent is valid, the accused infringer must show the lack of a written description by clear and convincing evidence. *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1351 (Fed. Cir. 2011); *see also* 35 U.S.C § 282. The written description must "clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (alteration in original) (requiring the description to reasonably convey to those skilled in the art that the inventor had possession of the claimed subject matter); *see also Allergan*, 796 F.3d at 1308 (noting the requirement is met where the description allows one skilled in the art to recognize the identity of the subject matter described). "[T]he test requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art." *Ariad*, 598 F.3d at 1351 ("[T]he level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology."). "The purpose of the written description requirement is to ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification." *Atl. Rsch. Mktg. Sys., Inc. v. Troy*, 659 F.3d 1345, 1354 (Fed. Cir. 2011)

(citation omitted).

*a. The Parties' Arguments*

LDG argues SANSI's only support for its defense is their technical expert Mr. Brett York's opinion, but his opinion conflates the enablement and written description requirements and lacks sufficient evidentiary support. (Doc. 107 at 8.) According to LDG, because Mr. York's opinion only pertains to the relevant Asserted Patent's claims lack of "channel" limitations (collectively, the "'channel' limitation claims"), rather than providing that a person of ordinary skill in the art would not understand the disclosure of a "channel" in the patent specification, Mr. York appears to make improper claim construction arguments. (*Id.* at 9–10.)

In response, SANSI argues LDG's specification failed to establish the full scope of the invention, at least based on LDG's apparent interpretation of it considering its infringement contentions. (Doc. 124 at 4 (citing *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005); *Rivera v. Int'l Trade Comm'n*, 857 F.3d 1315 (Fed. Cir. 2017).) SANSI notes that Mr. York explained "that the specification of the Asserted Patents describes a light fixture's member having a long, fully-enclosed channel, which extends all the way from a first aperture at the one end of the member to a second aperture at the other end of the member, to direct the flow of air to convect heat away from the LEDs." (*Id.* at 5.) But according to SANSI, and based on Mr. York's opinion, LDG's interpretation of "channel" is overly broad and stretches its scope to include apertures that are not aligned, i.e., "any open space or gap that air might potentially pass through," to describe the configurations not supported by the written description. (*Id.* at 5–7.) SANSI argues Mr. York's analysis and opinion are sufficient to create a genuine dispute of material fact as to the scope of the "channel" limitation claims. (*Id.*)

In reply, LDG expounds that the specification of the Asserted Patents generally describes the "channel" with the claimed "member" conducting heat from the LEDs to the channel, which is then removed by convection moving the air through the channel. (Doc. 139 at 6.) LDG further replies with three arguments. First, SANSI inappropriately

- 6 -

converts its noninfringement positions into written description arguments. (*Id.* at 6–7.) According to LDG, SANSI essentially argues that "channel" lacks a written description because figures show two different types of channels, one fully enclosed and the other that LDG uses for infringement contentions has a split opening, but as LDG sees it, that raises a claim construction argument intended to prove non-infringement instead of validity of the written description. (*Id.* at 7–8.) Second, LDG contends that SANSI's evidence purported to raise a genuine dispute of fact relates to Mr. York's discussion of a different product group than the one SANSI argues and does not provide evidentiary support. (*Id.* at 8.) And third, LDG argues SANSI gets the law wrong because the written description requirement relates to the disclosure of the specification compared to the claims and *LizardTech* and *Rivera* are distinguishable because the specification here does not differentiate a technology later claimed. (*Id.* at 9–10.)

### b. Claim Construction

Based on the foregoing arguments, the parties' dispute centers on the meaning and scope of claims with "channel" limitations.[2]  Accordingly, because the Court has not construed the term "channel," it must do so now.

"It is well established that 'claim construction is inherent in any written description analysis.'" *Lochner Techs., LLC v. Vizio, Inc.*, 567 F. App'x 931, 938 (Fed. Cir. 2014) (quoting *In re Katz Interactive Call Processing Pat. Litig.*, 639 F.3d 1303, 1319 (Fed. Cir. 2011)); *see also Koninklijke Philips Elecs. N.V. v. Cardiac Sci. Operating Co.*, 590 F.3d 1326, 1336 (Fed. Cir. 2010) ("A district court must base its analysis of written description under § 112, ¶ 1 on proper claim construction."). Claim construction is "the process of giving proper meaning to the claim language" and defining the scope of the protected invention. *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997). Words of a claim are generally given their ordinary and customary meaning, which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of

---

[2] The parties dispute "channel" limitations contained in the following claims: Claims 1 and 16 of the '700 Patent; Claims 1, 12, and 17 of the '923 Patent; Claims 1 and 15 of the '608 Patent; and Claim 14 of the '807 Patent. (Doc. 90-18 at 7–8; *see also* Docs. 90-2 to -5.)

the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005). This inquiry requires reading the claim's terms in the context of the entire patent, including the specification. *Id.* "[C]laim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.* at 1314.

The Asserted Patents share a common specification. However, the specification does not expressly define "channel." The specification's summary describes a "channel" as "extending through the member, of which the member can have any shape." (Doc. 90-3 at 8.) The summary also provides the "channel" corresponds to the shape of the member, but it can also be independent. (*Id.*) The summary describes that "[f]ins can be disposed within the channel to assist with the heat transfer. For example, the fins can extend from the surfaces into the channel, towards a core region of the member . . . . [T]he core region can include a point where the fins converge . . . [or] a member disposed within and extending along the channel and having a shape defining a second, inner channel that extends through the member." (*Id.* at 8–9.)

The detailed description similarly describes a "channel" as extending through the housing and connecting apertures at each end. (*Id.* at 9.) The description provides exemplary figures (100) showing a member (110*d*) configured to manage heat output by the LEDs with the channel (110*c*) extending through the housing (110) and connecting apertures (110*aa* and 110*ba*), as illustrated below.



FIG. 1    FIG. 4

1

2    (*Id.* at 3, 6.)  The description also provides that, for example in Figure 1 above, the

3    frusto-conical shape of the member (110*d*) creates a venturi effect, drawing air through the

4    channel (110*c*).  (*Id.* at 11.)  The air travels from the bottom end of (*110db*) of the member

5    (110*d*), through the channel (110*c*), and out the top end (110*da*).  (*Id.*)  Then to describe

6    the light fixture with a core region, the description provides essential the same.  For that

7    configuration (500), illustrated below, "[t]he channel (510) supports convection-based

8    cooling . . . as described in connect with [Figures] 1 and 2, the frusto-conical shape of the

9    member (110*d*) creates a venturi effect, drawing air through the channel (510).  The air

10   travels from the bottom end (110*b*) of the housing (110), through the channel (510), and

11   out the top end (110*a*)."



FIG. 5

20   (*Id.* at 7, 11 (parenthesis added).) The description further states "[i]n certain alternative

21   exemplary embodiments, the fins (505) converge within the channel (110*c*) so that there is

22   not an inner channel (510) within the channel (110*c*)."  (*Id.* at 11 (parenthesis added).)  And

23   describes an embodiment where "[a] channel (510) extends through the core region (505*b*),

24   within the channel (110*c*).  The fins (505) are spaced annularly around the channel (510).

25   Alternatively, one or more of the fins (505) can be independent of the facets (111) and can

26   be position radially in a symmetrical or nonsymmetrical pattern."  (*Id.*)

27        In context, although some claims describe a "channel" as "defined by the interior

28   surface of the member," the term is not so constrained and includes configurations where

there is a second "channel" extending through the core region.  That core region then can include a second member that defines the second, inner channel.  Each channel necessarily involves some defining boundary, although it varies depending on the shape, size, and configuration.  But the "channel" itself represents the negative space, as defined by that boundary, which provides a pathway for heat to transfer out of the member.  If for example, the fins converge on/at a point without creating an inner channel (unlike in Figure 5 above), the fins intersect the space within the channel, the dispersed space around the fins but within the channel nonetheless represent the "channel" defined by the inner surface of the member.  Therefore, the Court finds the plain and ordinary meaning of "channel" is a fixed path defined by either the member's or core region's member's interior surface in which heat generated by the LEDs is conducted to and convected out to the surrounding environment.

### c.  Analysis

LDG refutes SANSI's written description defense by citing to paragraphs of its expert Dr. Thomas Katona's report detailing the specification to the '700 Patent, which it argues would allow a person of ordinary skill in the art to recognize the subject matter of the claimed invention.  (Doc. 107 at 9 (citing Doc. 90 at 9–12 ¶¶ 35–44).)  LDG notes that the specification describes a "channel extending through the member is configured to transfer the heat output from LEDs by convection.  Heat from the LEDs is transferred to the surfaces by conduction and to the channel, which convects the heat away."  (*Id.*)  The specification also describes the channel as taking on various sizes and shapes and the possibility of multiple channels within a member.  (Doc. 90 at 9–12 ¶¶ 35–44.)

LDG has met its initial burden to show SANSI's written description defense is susceptible to a lack of clear and convincing evidence in light of Dr. Katona's findings.  *See Eli Lilly*, 251 F.3d at 962.  SANSI's rebuttal and reliance on Mr. York's report about the scope of "channel" in relation to the accused products fails because accused products are not relevant to the written description inquiry.  *See Guangzhou Yucheng Trading Co. v. Dbest Prod., Inc.*, 644 F. Supp. 3d 637, 668 (C.D. Cal. 2022) (citing *Moba, B.V. v.*

*Diamond Automation, Inc.*, 325 F.3d 1306, 1321 (Fed. Cir. 2003)). Further, although it is undisputed that no party has sought a construction of "channel," "[c]laim scope or construction is a question of law and the existence of a dispute as to that legal issue does not preclude summary judgement." *Tillotson, Ltd. v. Walbro Corp.*, 831 F.2d 1033, 1037 (Fed. Cir. 1987); *see also Nat'l Presto Indus., Inc. v. W. Bend Co.*, 76 F.3d 1185, 1189 (Fed. Cir. 1996) (holding disputes about the meaning of claim terms did not raise questions of material fact with respect to the issue of validity). The Court having construed "channel" declines to view SANSI's interpretation, which is based on their view of LDG's infringement contentions, as the correct one. SANSI's assumption as to the meaning of "channel" plagues the entire written description defense.

All that remains of SANSI's argument is reliance on Mr. York's conclusory statements that persons of ordinary skill in the art would not know the scope of a "channel." But an expert's unsupported conclusion is insufficient to raise a genuine issue of material fact. *See, e.g.*, *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1278 (Fed. Cir. 2004). And similar, SANSI's argument that "channel" covering unenclosed grooves and non-uniform "nooks and crannies" renders the written description over broad relates to its own products' configuration as evidence and is an attorney argument. *See, e.g.*, *Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 424 F.3d 1276, 1284 (Fed. Cir. 2005) ("Attorney argument is no substitute for evidence."). SANSI provides no evidence relevant to the inquiry and instead reframes the issue to ultimately serve their noninfringement position. *See, e.g.*, *DNA Genotek Inc. v. Spectrum Sols. L.L.C.*, 671 F. Supp. 3d 1105, 1119–20 (S.D. Cal. 2023); *SPEX Techs. v. Apricorn, Inc*, No. CV 16-07349JVS(AGRX), 2020 WL 1289546, at *5 (C.D. Cal. Jan. 21, 2020) (refusing to permit a litigant to "use a written description challenge as a way to backdoor an issue that should have been raised in the context of claim construction"). As the Federal Circuit has stated, "[i]t is incorrect to construe the claims contrary to the specification, and then hold the claims invalid because they are contrary to the specification." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1360 (Fed. Cir. 1998). But that is exactly what SANSI invites the Court to do, albeit

1   unsuccessfully.

2       SANSI's proffered caselaw is also distinguishable.   In *LizardTech*, the Federal

3   Circuit held a written description was inadequate because it contained limitations that the

4   claims exceeded in scope.  *See* 424 F.3d at 1344–47.   In *Rivera*, the Federal Circuit

5   similarly held that limitations in the specification describing coffee "pods" and a

6   corresponding receptable as distinct components did not cover a claim that taught an

7   integrated filter and cartridge as the same structure.  *See* 857 F.3d at 1320–23.  Even

8   viewing the facts in SANSI's favor, Mr. York surmised that the "entire purpose of the

9   alleged invention is for a channel, which extends all the way from the first aperture at the

10  end of the member to a second aperture at the other of the member, and is otherwise fully

11  enclosed, to be configured to transfer heat generated by the LEDs through convection."  As

12  such, a broad construction of "channel" based on LDG's purported infringement

13  contentions exceeds the scope of the written description.  (Doc. 124 at 5–6; Doc. 90-18

14  at 8–9.)  Mr. York, however, premised his opinion on the incorrect assumption that the

15  broad interpretation he deduced from LDG's infringement allegations was the correct one.

16  As the Court has explained, that is not the case, and the appropriate construction is

17  consistent even with Mr. York's findings.

18      SANSI fails to meet its burden on rebuttal to create a genuine dispute of material

19  fact, and is essentially an improper non-infringement argument.  Thus, the Court finds the

20  "channel" limitation claims at issue are not invalid for failing to meet the written

21  description requirement and will grant LDG's Motion on this issue.

                             2.  Enablement

23      A specification must teach those of ordinary skill in the art "how to make and use

24  the full scope of the claimed invention without undue experimentation."  *Liquid Dynamics*

25  *Corp. v. Vaughan Co.*, 449 F.3d 1209, 1224 (Fed. Cir. 2006) (citation omitted) (noting

26  "[s]ome experimentation is permissible although it cannot be unduly excessive").

27  Enablement is a question of law based on a court's factual findings.  *Id.*  Analyzing undue

28  experimentation involves considering: (1) "the quantity of experimentation necessary," (2)

"the amount of direction or guidance presented," (3) "the presence or absence of working examples," (4) "the nature of the invention," (5) "the state of the prior art," (6) "the relative skill of those in the art," (7) "the predictability or unpredictability of the art," and (8) "the breadth of the claims." *Enzo Life Scis., Inc. v. Roche Molecular Sys., Inc.*, 928 F.3d 1340, 1345–56 (Fed. Cir. 2019) (citing *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988)).

As is the case with the written description, "[t]he dispositive question of enablement does not turn on whether the accused product is enabled." *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997). The enablement requirement is met where the description enables any mode of making and using the invention. *Invitrogen Corp. v. Clontech Lab'ys, Inc.*, 429 F.3d 1052 (Fed. Cir. 2005). A party asserting lack of enablement must establish *some* experimentation is needed to practice the patented claim, and then the *Wands* factors provide factual considerations to determine whether experimentation is undue or sufficiently routine. *Alcon Rsch. Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1188 (Fed. Cir. 2014) (citing *In re Wands*, 858 F.2d at 737).

LDG argues that SANSI has failed to provide any evidence to support their lack of enablement argument and Mr. York's report does not provide any analysis of undue experimentation as required to support the defense. (Doc. 107 at 10.) In response, SANSI's enablement arguments are interwoven into their written description arguments discussed prior relating to the "channel" limitations claims, and argues the claims are overbroad. (*See* Doc. 124 at 4–9.) In reply, LDG maintains its initial contentions and argues SANSI improperly relies on non-infringement arguments without addressing the merits the enablement argument. (Doc. 130 at 10–11.)

SANSI appears to rely on *Wands*' breadth of claims factor to argue lack of enablement. Neither SANSI nor Mr. York proffer any actual evidence of any experimentation, let alone undue experimentation, was necessary to practice the claimed invention. SANSI's premises their argument on Mr. York's conclusory statement that the overbreadth of "channel" renders the description insufficient to make and use the invention without undue experimentation. (*See* Doc. 90-18 at 9–10.) As discussed, Mr. York's

opinion on the construction of "channel" is misplaced. Therefore, SANSI has failed to establish any evidence of experimentation to reach weighing the breadth of the claims, thereby failed to create a genuine dispute of material fact. *See Alcon*, 745 F.2d at 1188–89 (finding the district court erred in concluding a claim's breadth exceeded its scope of enablement because there was no evidence of experimentation to reach the *Wands* factors). Thus, the Court finds the "channel" limitation claims are not invalid for lack of enablement and will grant LDG's Motion on this issue.

### 3. Indefiniteness

LDG argues SANSI's indefiniteness defense fails because the Court has already constructed four of the "channel" limitations at issue, finding they are definite. (Doc. 107 at 11–13.) Specifically, LDG contends SANSI's only support for its defense lies in Mr. York's report, in which he addresses seventeen portions of claims with "channel" limitations, including four the Court constructed previously. (*Id.*) According to LDG, Mr. York treated all seventeen "channel" limitations as a monolith susceptible to a single analysis, and therefore the Court should do the same and impute its construction of definiteness on the remaining "channel" limitations. (*Id.*) LDG further argues Mr. York's overbreadth findings, which led him to conclude a person of ordinary skill in the art "would not know what portions of a light bulb comprise a 'channel,' and which do not," is irrelevant considering the test set out in *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). (*Id.* (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1340–41 (Fed. Cir. 2005).) LDG concludes that SANSI merely relies on conclusory statements that are insufficient to establish clear and convincing evidence of invalidity. (*Id.*)

In response, SANSI argues Mr. York's report raises a genuine dispute of material fact. (Doc. 124 at 9–11.) According to SANSI, Mr. York's report evinces that a person of ordinary skill in the art could not determine whether a particular gap or opening constitutes a "channel." (*Id.* (citing Doc. 90-18 at 11).) SANSI further argues the Court has not constructed the term "channel" and there is no definitive definition rendering the claims

indefinite. (*Id.*) SANSI expounds that the Court's construction of the four limitations only addressed a definiteness dispute about airflows in connection with the claimed member and whether it was clear when the accused products became infringing light fixtures. (*Id.*) As such, the previous construction does not appropriately encompass the present dispute. (*Id.*) SANSI also contends that LDG's representations as to the scope of "channel" are relevant to the definiteness inquiry. (*Id.* (citing *Cap. Sec. Sys., Inc. v. NCR Corp.*, 725 F. App'x 952, 959 (Fed. Cir. 2018) (unpublished)).)

In reply, LDG maintains that SANSI's infringement contentions are not relevant to the inquiry. (Doc. 139 at 11–12.) LDG argues that *Capital Security Systems* is inapposite because it does not pertain to a plaintiff's infringement contentions, rather it addresses a plaintiff's expert's arbitrary definition of a claim term that the specification tended to contradict. (*Id.*) LDG rejects SANSI's characterization of the Court's claim previous construction, arguing SANSI should have raised its arguments about whether channels actually act as a channel when it requested relief prior. (*Id.*)

Section 112, ¶ 2 establishes the definiteness requirement for a specification to "point out and distinctly claim the subject matter which the inventor or a joint inventor regards as the invention." *See PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1562 (Fed. Cir. 1996). "The test for indefiniteness is whether the claims, viewed in light of the specification and prosecution history, 'inform those skilled in the art about the scope of the invention with reasonable certainty.'" *Nevro Corp. v. Bos. Sci. Corp.*, 955 F.3d 35, 41 (Fed. Cir. 2020) (quoting *Nautilus*, 572 U.S. at 910) ("The test is not merely whether a claim is susceptible to differing interpretations. Such a test would render nearly every claim term indefinite so long as a party could manufacture a plausible construction."). The Supreme Court in *Nautilus* explained, the definiteness requirement entails a "delicate balance," considering inherent limitations of language and involves some uncertainty, while "a patent must be precise enough to afford clear notice of what is claimed" apprising the public of what is open to them. 572 U.S. at 909 (citation omitted).

LDG has met its burden. Mr. York's report, once again, frames the issue in light of

the accused products and appears to conflate whether SANSI was able to ascertain the nature of its own products to determine infringement, rather than whether the claims delineate to those skilled the in the art the bounds of the invention. *See, e.g.*, *SmithKline*, 403 F.3d at 1340–41 ("The test for indefiniteness does not depend on a potential infringer's ability to ascertain the nature of its own accused product to determine infringement, but instead on whether the claim delineates to a skilled artisan the bounds of the invention."). Even distilling SANSI's argument to the purported overbreadth of the claims, the Federal Circuit has tersely stated, "a claim is not indefinite just because it is broad." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1347 (Fed. Cir. 2022). Descriptive words may inherently result in a broader claim scope than a claim defined with mathematical precision. *Id.* Terms are indefinite where they "provide insufficient guidance as to any objective boundaries for the claims," including those that are "'purely subjective' such that their scope cannot be determined with reasonable certainty." *Id.* at 1348 (citation omitted). Ultimately, descriptive terms "must provide objective boundaries" to those skilled in the art in the context of the invention. *Id.* at 1349.

Mr. York's distortion of the "channel" limitations invites the overbreadth for which SANSI complains. Mr. York's concerns are a "channel" covers "any hollow portion of any light bulb that air might potentially pass through, some of the time," but his concerns are factually unsupported. (Doc. 90-18 at 10 (citing LDG's January 30, 2023 Disclosure of Asserted Claims and Infringement Contentions (*see* Doc. 111-2 at 8, 10)).) LDG's January 30, 2023 Asserted Claims and Infringement Contentions delineate "[t]he channel is defined by the interior surface of the member," for the accused product Mr. York discussed. (Doc. 111-2 at 8.) This language is consistent with Claim 1 of the '923 Patent, which states "a channel extending from the first aperture to the second aperture *and defined by the interior surface of the member*." (Doc. 90-3 at 12 (emphasis added).) Further, all claims Mr. York points out define the "channel" by the interior surface of the member and do not address the core region providing for a second inner channel. (*See* Doc. 90-18 at 7–8.)

1    These claims do not provide for a subjective scope. The interior surface of the

2    member objectively defines the scope of the "channel." This is simply not the case where

3    the scope of "channel" renders the term arbitrary because it is entirely consistent with the

4    construction the Court found based on the plain and ordinary meaning and the term. *Cf.*

5    *Cap. Sec. Sys.*, 725 F. App'x at 959 (noting the disputed phrase had no commonly accepted

6    definition). Thus, SANSI has failed to establish a genuine dispute of material fact to

7    support its indefiniteness defense. The Court finds that the "channel" limitation claims are

8    not invalid for indefiniteness and will grant LDG's Motion on this issue.

9                        4. <u>Anticipation</u>

10    SANSI moves for summary judgment that Claims 1–3, 5, 7, 9, 10, 12, 13, 15, 17,

11    and 18 of the '923 Patent, Claims 15–16 and 18 of the '608 Patent, and Claims 14 and 17

12    of the '807 Patent (collectively, "the Challenged Claims") are invalid as anticipated by U.S.

13    Patent No. 6,831,303 to Dry ("Dry"). (Doc. 109 at 2.)[3] For the following reasons, the

14    Court finds that Dry anticipates Claims 1–3, 7, 9, 12, 13, 15, 17, and 18 of the '923 Patent;

15    Claims 15, 16, and 18 of the '608 Patent; and Claims 14 and 17 of the '807 Patent, and are

16    therefore invalid. The Court, however, finds that Claims 5 and 10 of the of the '923 Patent

17    are not invalid as anticipated by Dry.

18    The Court begins with the applicable law. Pre-AIA 35 U.S.C. § 102(a) provides

19    that a patent is invalid if "the invention was known or used by others in this country, or

20    patented or described in a printed publication in this or a foreign country, before the

21    invention thereof by the applicant for patent." "Section 102 embodies the concept of

22    novelty—if a device or process has been previously invented (and disclosed to the public),

23    then it is not new, and therefore the claimed invention is 'anticipated' by the prior

24    invention." *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008).

25    Prior art patents are presumed enabled. *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314

26    F.3d 1313, 1354 (Fed. Cir. 2003). "[A]nticipation is a question of fact," amenable to

27    summary judgment. *Zenith Elecs. Corp. v. PDI Commc'n Sys., Inc.*, 522 F.3d 1348,

28    _____

[3] The parties do not dispute that Dry was patented on December 14, 2004, or that the Challenged Claims have an earliest priority date of September 19, 2007.

1356–57 (Fed. Cir. 2008); *see also Microsoft Corp. v. Biscotti, Inc.*, 878 F.3d 1052, 1068 (Fed. Cir. 2017). "A claim is anticipated only if each and every element is found within a single prior art reference, arranged as claimed," as shown through clear and convincing evidence. *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1294 (Fed. Cir. 2015) (citing *Net MoneyIn*, 545 F.3d at 1369); *ATEN Int'l Co. v. Uniclass Tech. Co.*, 932 F.3d 1364, 1368 (Fed. Cir. 2019). As the Federal Circuit explained:

> The meaning of the expression "arranged as in the claim" is readily understood in relation to claims drawn to things such as ingredients mixed in some claimed order. In such instances, a reference that discloses all of the claimed ingredients, but not in the order claimed, would not anticipate, because the reference would be missing any disclosure of the limitations of the claimed invention "arranged as in the claim." But the "arranged as in the claim" requirement is not limited to such a narrow set of "order of limitations" claims. Rather, our precedent informs that the "arranged as in the claim" requirement applies to all claims and refers to the need for an anticipatory reference to show all of the limitations of the claims arranged or combined in the same way as recited in the claims, not merely in a particular order. The test is thus more accurately understood to mean "arranged or combined in the same way as in the claim.

*Net MoneyIn*, 545 F.3d at 1370. Arrangement does not require the prior art to "disclose the elements in the very same terms used by the patent." *Adasa Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 910, 913 (Fed. Cir. 2022) ("The invention is not the language of the [claim] but the subject matter thereby defined." (citation omitted)). "Before the factual question of anticipation may be addressed, a court must first properly construe the claims before it." *Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*, 344 F.3d 1186, 1195 n.4 (Fed. Cir. 2003).

### a. The Parties' Arguments

SANSI contends that Dry discloses every element of the Challenged Claims. (Doc. 109 at 4.) According to SANSI, Dry and the Challenged Claims "recite a light fixture 'member' that has a channel that naturally has two apertures (holes) at opposite ends and at least two LEDs on its exterior. [Both] also recite air entering the channel and heat dissipating from the LEDs to that air." (*Id.*) SANSI points to Claim 14 of the '807 Patent as representative because all the Challenged Claims are nearly identical, Mr. York's report detailing the Challenged Claims, and a chart it created to correlate the Challenged Claims

with Dry (the "Anticipation Chart"). (*Id.* at 4–6.) SANSI further argues that, based on this Court's broad construction of "light fixture," Dry discloses a system for producing and distributing light for illumination. (*Id.* at 6–7.) SANSI characterizes Dr. Katona's report as conclusory and rejects his attempts to distinguish Dry's "light source" from the Challenged Claims' "light fixture" as inconsistent with the Court's broad construction and merely a semantic game. (*Id.* at 7–10.) SANSI then argues Dry also discloses unique limitation in Claim 1 of the '923 Patent, which requires LEDs on opposite ends of the channel. (*Id.* at 10–11.) SANSI expounds that Claim 2 of the '923 Patent includes another limitation that the LEDs are "co-planar," of which Mr. York's report highlights Dry includes. (*Id.* at 11–13.)

In response, LDG contends that Dry discloses a mountable component, i.e., a light emitting element, rather than the light fixture in which the light emitting element is placed. (Doc. 127 at 6–9.) LDG posits that based on the Court's construction of "light fixture," Dry simply discloses one of the elements without teaching other "critical" elements of a light fixture. (*Id.*) Therefore, according to LDG, SANSI fails to meet its burden to establish anticipation and Dr. Katona's report otherwise disputes that Dry discloses a light fixture precluding summary judgment. (*Id.* at 9–11.) As to Claim 2 of the '923 Patent, LDG argues Mr. York's report insufficiently explains how Dry includes "co-planar" LEDs, and instead he inappropriately relied on the figures to deduce the LEDs were co-planar because they showed similar spacing. (*Id.* at 11–13.) LDG concludes by procedurally faulting SANSI for using the Anticipation Chart. (*See id.* at 13–15.) According to LDG, SANSI using Claim 14 of the '807 Patent as representative of the Challenged Claims fails to sufficiently raise anticipation of the remaining claims. (*Id.*) And additionally, SANSI's Statement of Facts inadequately cites to the record to propose facts supporting anticipation and the Anticipation Chart cannot overcome the lack of specific references. (*Id.*)

SANSI replies to LDG's contentions by arguing (1) Dry's disclosure of a light source mountable into a fixture thereby discloses such a fixture; (2) LDG abandoned the Court's construction of "light fixture" because the claim does not require the elements LDG

believes are necessary; and (3) requesting that if the Court finds "light fixture" excludes mountable components, the Court should amend its construction to include such a limitation. (Doc. 138 at 3–5.) Regarding Claim 2 of the '923 Patent, SANSI argues Mr. York's reliance on the figures is supported because they accurately depict co-planar LEDs on opposite sides of the channel and the Claim 2 does not require mathematical precision LDG argues is necessary. (*Id.* at 5–6.) SANSI replies to LDG's procedural contention by arguing the Court should put form over substance and LDG does not actually refute the similarities. (*Id.* at 6–7.) SANSI further points out that Mr. York's report, which SANSI repeatedly cited, provides evidence for every claim at issue and the Anticipation Chart correlates the evidence to remedy the need to sift through the record. (*Id.*)

### b. Representative Claim and the Anticipation Chart

The Court begins by noting that SANSI indicated at oral argument that its anticipation contentions are not purely based on the representativeness of the Claim 14 of the '807 Patent. SANSI primarily relies on Mr. York's report in conjunction with the Anticipation Chart containing record citations for the relevant claims' elements. In that regard, SANSI's arguments on the representativeness of the claim illustrates the broadest example for brevity and addresses unique claim limitations where it determined it was necessary, e.g., lights on opposite ends the channel and a co-planar arrangement. LDG maintained at oral argument that SANSI's Anticipation Chart was inadequate and is attorney argument. And as such, LDG argued SANSI failed to establish evidence for the Court to find Dry anticipates the Challenged Claims. However, LDG has not addressed any specific limitations in the Challenged Claims beyond its broad argument on what constitutes a "light fixture" and the "co-planar" issue.

The Court does not fault SANSI for utilizing the Anticipation Chart with the coinciding citations. In fact, some district courts require charts to accompany invalidity contentions. *See, e.g.*, N.D. Cal. Pat. R. 3-3(c). Although laborious, in a technical case such as this coupled with the number of Challenged Claims, which in turn contain various elements, the Court cannot ignore the evidence presented. The Court finds that SANSI

1  adequately directed the Court's attention to the Anticipation Chart and thereby Mr. York's
2  Report, and in the interest of deciding the case on the merits, rather than technicalities, the
3  Court will proceed in evaluating SANSI's proffered evidence supporting anticipation.[4]

4                          *c.  The Challenged Claims*

5         The Court proceeds by noting each element of the independent Challenged Claims
6  with a bolded and bracketed letter below.  To facilitate the analysis, the Court will use the
7  assigned letters to match elements across those claims.  The letters may very across the
8  Challenged Claims despite the elements' language essentially mirroring the corresponding
9  claim due to slight variations in phrasing or positioning within a claim.  The Court did not
10 assigned letters for the dependent claims and will refer to them by claim number, except
11 for where a dependent claim contains more than one element.  *See* 35 U.S.C. § 112(d)
12 (describing a dependent claim incorporates all of the limitations of an independent claim
13 and specifies a further limitation).  The Court's analysis first addresses SANSI's proffered
14 representative claim as a guidepost for the remaining Challenged Claims.  Second, the
15 Court will address independent Challenged Claims in relation to the representative claim
16 and provides a table correlating the notated elements as outlined above.  Third, the Court
17 will address the limitations in the dependent Challenged Claims.  Finally, as the parties
18 separately argue the "co-planar" issue, the Court will address it separate from the other
19 dependent Challenged Claims.

20        With this structure in mind, the Court turns to the Challenged Claims, beginning
21 with the representative claim—Claim 14 of the '807 Patent.

22 Claim 14 of the '807 Patent provides:

23        A light fixture comprising:
             **[A]** a member comprising:
24                 **[B]** an exterior surface;
                   **[C]** an interior surface
25                 **[D]** a first aperture disposed along a top end of the member;
                   **[E]** a second aperture disposed along a bottom end of the
26                 member, and a channel within the member extending from the
                   first aperture to at least the second aperture and defined by the
27                 interior surface; and

28 ─────────────────────
[4] For the following discussion, the Court notes that it only considered accurate citations to
Mr. York's report contained in the Anticipation Chart.

**[F]** at least one first light emitting diode (LED) coupled to a first facet of the exterior surface; and

**[G]** at least one second LED coupled to a second facet of the exterior surface, wherein air enters the channel and transfers at least a portion of the heat generated by the first and second LEDs through the first aperture.

Claim 17 of the '807 Patent provides:

The light fixture of claim **14**, wherein the first and second LEDs are in thermal communication with the member and configured to transfer heat to the member.

Claim 15 of the '608 Patent provides:

A light fixture, comprising:
**[A]** a member comprising:
**[B]** an interior surface;
**[C]** a first aperture;
**[D]** a second distal aperture, and
**[E]** a channel within the member extending from the first aperture to at least the second aperture and defined by the interior surface of the member;
**[F]** at least one first light emitting diode (LED) coupled adjacent a first side of the channel; and
**[G]** at least one second LED coupled adjacent a second side of the channel, wherein air enters the channel and transfers at least a portion of the heat generated by the first and second LEDs through the first aperture.

Claim 16 of the '608 Patent provides:

The light fixture of claim **15**, wherein the second side of the channel is opposite the first side of the channel.

Claim 18 of the '608 Patent provides:

The light fixture of claim **15**, wherein the first and second LEDs are in thermal communication with the member and configured to transfer heat to the member by con[du]ction.[5]

Claim 1 of the '923 Patent provides:

A light fixture, comprising:
**[A]** a member comprising:
**[B]** a top end comprising a first aperture;
**[C]** a bottom end comprising a second aperture,
**[D]** a channel extending from the first aperture to the second aperture and defined by an interior surface of the member;
**[E]** a plurality of light emitting diodes (LEDs) disposed on the fixture adjacent to the channel, wherein at least one LED is located on one side of the channel and at least another LED is located on an opposite side of the channel;

---
[5] The Court previously corrected this claim language because of a typographical error, which previously read "convection." (Doc. 68 at 20–21.)

**[F]** wherein air enters the channel through the second aperture and exits the channel through the first aperture; and

**[G]** wherein the LEDs transfer heat through the member to the air in the channel.

Claim 2 of the '923 Patent provides:

The light fixture of claim **1**, wherein the at least one LED and the at least another LED are positioned co-planar to each other.

Claim 3 of the '923 Patent provides:

The light fixture of claim **1**, further comprising a plurality of LED receiving surfaces, wherein the LED receiving surfaces are disposed at least partially around the channel.

Claim 5 of the '923 Patent provides:

The light fixture of claim **1**, wherein the member further comprises:

**[A]** a core region extending centrally along at least a portion of the channel; and

**[B]** one or more fins extending radially outward from the core region.

Claim 7 of the '923 Patent provides:

The light fixture of claim **1**, wherein the plurality of LEDs are asymmetrically disposed about the channel and configured to emit an asymmetric light output.

Claim 9 of the '923 Patent provides:

The light fixture of claim **1** further comprising a plurality of receiving surfaces, each receiving surface configured to receive at least one LED and wherein the plurality of receiving surfaces provide a plurality of different configuration for a positioning of the plurality of LEDs, each of the plurality of different configuration corresponding to a different optical distribution of the light fixture.

Claim 10 of the '923 Patent provides:

The light fixture of claim **9**, wherein the plurality of receiving surfaces are provided on an outer surface of the interior surface of the member.

Claim 12 of the '923 Patent provides:

A light fixture, comprising:

**[A]** a member comprising:

**[B]** an interior surface;

**[C]** an exterior surface;

**[D]** a first aperture disposed along a first end;

**[E]** a second aperture disposed along a distal second end;

**[F]** a channel extending from the first aperture to the second aperture and defined by the interior surface; and

**[G]** a plurality of light emitting diodes (LEDs) positioned adjacent to the channel; wherein a first of the plurality of LEDs is disposed adjacent a first portion of the channel and a second of the plurality of

LEDs is disposed adjacent a second portion of the channel different than the first portion; and

**[H]** wherein air passes through the channel from the second aperture to the first aperture and transfers at least a portion of heat generated by the first LED and the second LED through the first aperture.

Claim 13 of the '923 Patent provides:

The light fixture of claim **12**, wherein the first LED and the second LED are positioned co-planar to each other.

Claim 15 of the '923 Patent provides:

The light fixture of claim **12**, wherein the heat is transferred from the first and second LED to the member by conduction; and wherein the heat is transferred from the member through the channel with the air by convection.

Claim 17 of the '923 Patent provides:

A light fixture, comprising:
    **[A]** a member comprising:
        **[B]** an interior surface
        **[C]** a first aperture;
        **[D]** a second distal aperture,
        **[E]** a channel through the member extending from the first aperture to the second aperture and defined by the interior surface of the member;
    **[F]** at least one first light emitting diode (LED) coupled adjacent a first side of the channel;
    **[G]** at least one second LED coupled adjacent a second side of the channel;
    **[H]** wherein air enters the channel and transfers at least a portion of the heat generated by the first and second LEDs through the first aperture.

Claim 18 of the '923 Patent provides:

The light fixture of claim **17**, wherein the second side of the channel is opposite the first side of the channel.

(Doc. 110-1 at 12–13 ('923), 25 ('608), 38 ('807).)

*d. Claim 14 of the '923 Patent*

The Court now turns to the representative claim and SANSI's proffered evidence supporting anticipation found in Dry, and then turns to the relevant variances in the remaining Challenged Claims. SANSI contends that Mr. York's report addresses Dry's disclosure of each element of Claim 14 of the '807 Patent, and its Anticipation Chart demonstrates the same is true for all Challenged Claims. (Doc. 109 at 5–6 (citing Doc. 110-1 at 63–64 ¶¶ 1123–36, 79–83 ¶¶ 1163–69, 141–44 ¶¶ 1341–48, 175 ¶¶ 1444–46,

202–07 ¶¶ 1541–55; Doc. 110 at 2–3 ¶ 8 (citing Doc. 110-2 (the Anticipation Chart)).)

The Court first addresses the preamble— "A light fixture comprising"—which are nearly identical for each Asserted Patent. (*See* Doc. 110-1 at 12, 25, 38.) The Court previously adopted LDG's broad construction of "light fixture" to mean "a system for producing, controlling, and/or distributing light for illumination." (Doc. 68 at 3–6.) Mr. York opined that Dry is directed to a light fixture because it describes a mountable member, of which the "light source . . . is mounted into a fixture and retained in position by mounting clips." (Doc. 110-1 at 63–64 ¶¶ 1123–28, 202 ¶¶ 1541–42.) In this regard, the mountable "light source" is the fixture under the Court's broad construction. LDG, however, harps on the mountable aspect of Dry to argue Dry is simply a light emitting element that mounts into the fixture, not the fixture itself. (Doc. 127 at 7–9.)

LDG proceeds from a fundamentally flawed premise by imputing elements into what a "light fixture" is under the Court's construction, of which the Court previously rejected. During claim construction, SANSI attempted to narrow the meaning by arguing "light fixture" is defined "as one or more light emitting elements, one or more sockets, connectors, or surfaces configured to position and connect the light emitting elements to a power supply, an optical device configured to distribute light from the light emitting elements, and mechanical components for supporting or suspending the fixture." (Doc. 68 at 5.) The Court rejected such a reading, and yet LDG now argues that, for example, Dry fails to disclose a power supply. (Doc. 127 at 3 & n.1.) Dry's use of the term "fixture," as opposed to some other term, to describe the recipient of the light source does not distract from the fact that Dry is designed as a system to produce, control, and/or distribute light. Dry describes the "light source" as a "general illumination device" that uses LEDs to produce and emit light. (*See* Doc. 110-1 at 43–44.)

Dr. Katona's rebuttal report also suffers the same flaw and does not give rise to a genuine dispute of fact on this issue. (Doc. 128-1 at 17 ¶ 22; *see also* Doc. 110-1 at 259–62 ¶¶ 631–42.) Dr. Katona opined that "Dry clearly requires more than disclosed in order to properly operate to produce, control, and/or distribute light, as required by the Court's

1    construction." (Doc. 110-1 at 262 ¶ 642.)  Dr. Katona cites to the Asserted Patent's shared

2    description for the proposition that Dry does not disclose electronics capable of supplying

3    electrical current, therefore it does not disclose a light fixture.  (*See, e.g.*, Doc. 90-2 at 10.)

4    The description further explains that for certain embodiments LEDs are mounted to facets

5    using a substrate, and that substrate is connected to support circuitry or drivers to supply

6    electrical power to the LEDs.  (*Id.* at 11.)  Dry explains that LEDs are mounted to a "printed

7    circuit," which has a "[e]lectrical connector" that is "couplable to a separate power supply

8    to receive electric current." (Doc. 110-1 at 44.)  One does not need to be skilled in the art

9    to understand that both disclose a system that requires delivery of electrical power to

10   operate.  As construed by the Court, and previously advocated for by LDG, "light fixture"

11   does not contain the limitations Dr. Katona mistakenly relied on and LDG now seeks to

12   invoke.  Therefore, the Court concludes Dry discloses a "light fixture."[6]

13          Next, SANSI relies on Mr. York's report, in which he addresses elements **[A]**, **[B]**,

14   and **[C]** of Claim 14 of the '807 collectively to argue Dry discloses each.  (Doc. 109 at 5

15   (citing in part Doc. 110-1 at 64–66 ¶¶ 1129–31, 202 ¶¶ 1543–44).)  Mr. York opined that

16   Dry discloses these three elements because it explains the light fixture includes a

17   "elongated member," which then includes and an "interior of the elongate heat sink" or

18   "other extruded elongate member," and an "exterior surface" or "outer surface."  (Doc.

19   110-1 at 64–66 ¶¶ 1129–31, 202 ¶¶ 1543–44.)  LDG does not appear to dispute that Dry

20   includes this language, and instead argues that SANSI's recitation of language quoted from

21   the three elements does not appear in Dry verbatim.  (*See* Doc. 128 at 8 ¶ 27.)  However,

22   as SANSI cited to, and Mr. York quoted, Dry expressly explains that the invention includes

23   a "member," an "interior" of the member, and an "exterior surface."  (*See* Doc. 110-1 at

24   43–44.) Therefore, the Court finds that Dry discloses elements **[A]**, **[B]**, and **[C]** of Claim

25   _____

26   [6]  SANSI's Anticipation Chart further cites to various sections of Dry that describe it as a
     "general illumination device" and as providing light output but are not directly cited in Mr.
27   York's report.  (*See* Doc. 110-2 at 42.)  LDG posits that this is attorney argument and
     insufficient as evidence to support the Court granting summary judgement.  The Court
     declines to view direct quotes from the Dry patent as attorney argument.  Dry's description
28   is evidence of what it discloses, and, although Mr. York's report is sufficient to find Dry
     discloses a "light fixture," the evidence further strengthens the Court's conclusion.

1    14 of the '807 Patent.

2        Relying on Mr. York's report, SANSI argues that Dry discloses elements **[D]** and

3    **[E]** of Claim 14 of the '807 Patent because it describes a light fixture member with "a first

4    aperture at the top and a second aperture at the bottom . . . [and] an interior channel

5    extending from the first aperture to the second aperture." (Doc. 109 at 5 (citing Doc. 110-1

6    at 66–68 ¶¶ 1132–36, 202–04 ¶¶ 1545–48).) Mr. York opined that Dry discloses "a

7    member comprising a first end comprising a first aperture, and a channel extending from

8    the first aperture to the second aperture and defined by the first surface." (Doc. 110-1

9    at 203 ¶ 1546 (citing Doc. 110-1 at 41, 43–44).) Dry expressly provides "the elongate

10   thermally conductive member comprises a channel." (*Id.* at 43.) Mr. York expounded that

11   Dry explains that air enters this channel at the bottom end and through convection exits the

12   top end. (*Id.* at 203–04 ¶¶ 1546–47.) And as such, Mr. York explained that if Dry were

13   oriented vertically, a person of ordinary skill in the art would understand the top end

14   represents the "first aperture" referred to in element **[D]** and the bottom end reflects the

15   "second aperture" element **[E]**. The channel runs between the first and second apertures

16   and is defined by the interior surface of the heat sink, i.e., the thermally conductive

17   member's interior surface. (*Id.* at 79 ¶ 1164, 230 ¶ 1546.) Mr. York provided the following

18   annotated figures to identify Dry's teachings:

19

20

21

22

23

24

25

26

27

28   (*Id.* at 203.) Again, LDG does not dispute Mr. York's opinion on these elements in any

meaningful way, nor does Dr. Katona's rebuttal report address these limitations specifically to raise a dispute.  (*See id.* at 262–70, 313–14; Doc. 128 at 8–9 ¶ 28.)  Thus, the Court finds that Dry discloses elements **[D]** and **[E]** of Claim 14 of the '807 Patent.

Lastly, SANSI argues Dry discloses elements **[F]** and **[G]** of Claim 14 of the '807 Patent because it describes "LEDs coupled to facets of the exterior surface . . . [and] air enters the channel and transfers heat generated by the LEDs through the first aperture." (Doc. 109 at 5 (citing in part Doc. 110-1 at 79–83 ¶¶ 1163–69, 141–43 ¶¶ 1341–48, 175 ¶¶ 1444–46, 204–07 ¶¶ 1549–55).)  SANSI cites to portions of Mr. York's report, in which he opined that Dry discloses at least a first LED coupled to a first printed circuit, at least a second LED coupled to a second printed circuit, both of which are located on the exterior surface, and those LEDs generate heat that is removed by air travelling through the channel and out of the first aperture, i.e., the top end discussed above.  (*Id.*; *see also* Doc. 110-1 at 43–44.)  LDG does not address Mr. York's opinion on these elements, which is aptly based on Dry.  The Court finds that Dry discloses elements **[F]** and **[G]** of Claim 14 of the '807 Patent.

Accordingly, SANSI has shown through clear and convincing evidence that by disclosing each element, Dry anticipates Claim 14 of the '807 Patent.  And therefore, the Court holds that Claim 14 of the '807 Patent is invalid.

### e.  *Independent Claims of the '608 and '923 Patents*

The Court now addresses the remaining independent Challenged Claims, which include Claim 15 of the '807 Patent and Claims 1, 12, and 17 of the '923 Patent.  The Court will analyze the claims dependent on these independent claims separately.  The following chart compares the notated elements of the representative claim to the four independent claims and their elements' respective assigned letters. The Court has italicized the elements' terms that are the same or essentially identical within a row.

| Claim 14 of the '807 Patent | Claim 15 of the '608 Patent | Claim 1 of the '923 Patent | Claim 12 of the '923 Patent | Claim 17 of the '923 Patent |
|---|---|---|---|---|
| Preamble: A *light fixture* | Preamble: A *light fixture,* | Preamble: A *light fixture,* | Preamble: A *light fixture* | Preamble: A *light fixture* |

| *comprising*: | *comprising*: | *comprising*: | *comprising*: | *comprising*: |
|---|---|---|---|---|
| **[A]** a *member comprising*: | **[A]** a *member comprising*: | **[A]** a *member comprising*: | **[A]** a *member comprising*: | **[A]** a *member comprising*: |
| **[B]** an *exterior surface*; | | | **[C]** an *exterior surface*; | |
| **[C]** an *interior surface*; | **[B]** an *interior surface*; | **[D]** an *interior surface* of the member; | **[B]** an *interior surface*; | **[B]** an *interior surface*; |
| **[D]** a *first aperture* disposed along a top end of the member; | **[C]** a *first aperture*; | **[B]** a top end comprising a *first aperture*; | **[D]** a *first aperture* disposed along a first end; | **[C]** a *first aperture*; |
| **[E]** a *second aperture* disposed along a bottom end of the member, and a *channel within the member extending from the first aperture to at least the second aperture* and *defined by the interior surface*; and | **[D]** a *second distal aperture*, and **[E]** a *channel within the member extending from the first aperture to at least the second aperture* and *defined by the interior surface* of the member; | **[C]** a bottom end comprising a *second aperture*, **[D]** a *channel extending from the first aperture to the second aperture* and *defined by an interior surface* of the member; | **[E]** a *second aperture* disposed along a distal second end; **[F]** a *channel extending from the first aperture to the second aperture* and *defined by the interior surface*; and | **[D]** a *second distal aperture*, **[E]** a *channel through the member extending from the first aperture to the second aperture* and *defined by the interior surface* of the member; |
| **[F]** at least one first light emitting diode (LED) coupled to a first facet of the exterior surface*; and | **[F]** at least one first light emitting diode (LED) coupled adjacent a first side of the channel*; and | **[E]** a plurality of light emitting diodes (LEDs) disposed on the fixture adjacent to the channel, wherein at least one LED is located on one side of the channel and . . . | **[G]** a plurality of light emitting diodes (LEDs) positioned adjacent to the channel; wherein a first of the plurality of LEDs is disposed adjacent a first portion of the channel . . . | **[F]** at least one first light emitting diode (LED) coupled adjacent a first side of the channel*; |
| **[G]** at least one second LED coupled to a second facet of the exterior surface, wherein air enters the channel and transfers at least a portion | **[G]** at least one second LED coupled adjacent a second side of the channel, wherein air enters the channel and transfers at least a portion | **[E]** and at least another LED is located on an opposite side of the channel*; **[F]** wherein air enters the channel through the second aperture | **[G]** and a second of the plurality of LEDs is disposed adjacent a second portion of the channel different than the first portion*; and | **[G]** at least one second LED coupled adjacent a second side of the channel*; **[H]** wherein air enters the channel and transfers at |

| *comprising*: | *comprising*: | *comprising*: | *comprising*: | *comprising*: |
|---|---|---|---|---|
| **[A]** a *member comprising*: | **[A]** a *member comprising*: | **[A]** a *member comprising*: | **[A]** a *member comprising*: | **[A]** a *member comprising*: |
| **[B]** an *exterior surface*; | | | **[C]** an *exterior surface*; | |
| **[C]** an *interior surface*; | **[B]** an *interior surface*; | **[D]** an *interior surface* of the member; | **[B]** an *interior surface*; | **[B]** an *interior surface*; |
| **[D]** a *first aperture* disposed along a top end of the member; | **[C]** a *first aperture*; | **[B]** a top end comprising a *first aperture*; | **[D]** a *first aperture* disposed along a first end; | **[C]** a *first aperture*; |
| **[E]** a *second aperture* disposed along a bottom end of the member, and a *channel within the member extending from the first aperture to at least the second aperture* and *defined by the interior surface*; and | **[D]** a *second distal aperture*, and **[E]** a *channel within the member extending from the first aperture to at least the second aperture* and *defined by the interior surface* of the member; | **[C]** a bottom end comprising a *second aperture*, **[D]** a *channel extending from the first aperture to the second aperture* and *defined by an interior surface* of the member; | **[E]** a *second aperture* disposed along a distal second end; **[F]** a *channel extending from the first aperture to the second aperture* and *defined by the interior surface*; and | **[D]** a *second distal aperture*, **[E]** a *channel through the member extending from the first aperture to the second aperture* and *defined by the interior surface* of the member; |
| **[F]** at least one first light emitting diode (LED) coupled to a first facet of the exterior surface*; and | **[F]** at least one first light emitting diode (LED) coupled adjacent a first side of the channel*; and | **[E]** a plurality of light emitting diodes (LEDs) disposed on the fixture adjacent to the channel, wherein at least one LED is located on one side of the channel and . . . | **[G]** a plurality of light emitting diodes (LEDs) positioned adjacent to the channel; wherein a first of the plurality of LEDs is disposed adjacent a first portion of the channel . . . | **[F]** at least one first light emitting diode (LED) coupled adjacent a first side of the channel*; |
| **[G]** at least one second LED coupled to a second facet of the exterior surface, wherein air enters the channel and transfers at least a portion | **[G]** at least one second LED coupled adjacent a second side of the channel, wherein air enters the channel and transfers at least a portion | **[E]** and at least another LED is located on an opposite side of the channel*; **[F]** wherein air enters the channel through the second aperture | **[G]** and a second of the plurality of LEDs is disposed adjacent a second portion of the channel different than the first portion*; and | **[G]** at least one second LED coupled adjacent a second side of the channel*; **[H]** wherein air enters the channel and transfers at |

| | | | | |
|---|---|---|---|---|
| of the *heat generated* by the first and second LEDS *through the first aperture.* | of the *heat generated* by the first and second LEDs *through the first aperture.* | and *exits the channel through the first aperture*; and<br><br>**[G]** *wherein the LEDs transfer heat through the member to the air in the channel.* | **[H]** wherein *air passes through the channel* from the second aperture *to the first aperture and transfers* at least a portion of *heat generated* by the first LED and the second LED *through the first aperture.* | least a portion of the *heat generated* by the first and second LEDs *through the first aperture.* |

As the table indicates, all elements correspond to the elements of Claim 14 of the '807 Patent with slight variations in terms and location within a claim. Mr. York opined to each element, including the slight variations, concluding that Dry discloses the claims for essentially the same reasons the Court discussed for Claim 14 of the '807 Patent. (Doc. 110-1 at 138–44 ¶¶ 1334–48, 163–67 ¶¶ 1404–17, 197–99 ¶¶ 1516–24; *see also* Doc. 110-2 at 15–20, 32–37.) For an example of the variations, element **[F]** of Claim 15 of the '807 Patent specifies that the LEDs are arranged on adjacent sides of the channel and element **[E]** of Claim 1 of the '923 Patent specifies the LEDs are arranged on opposite sides, whereas Claim 14 of the '807 Patent does not include either limitation. Mr. York opined that Dry discloses various LED arrangements, whether they are on opposite sides or adjacent sides of the channel, as shown in the cross-section view of Dry below.



(Doc. 110-1 at 141–43 ¶¶ 1342–43, 173–74 ¶¶ 1440–43; *see also id.* at 43–44.)  As Mr. York indicated, Dry teaches that the LEDs attach to the printed circuits running along the exterior surface and disposed of on opposite or adjacent sides.  LDG has failed to refute Mr. York's opinion on these issues in any meaningful way, aside from the arguments related to the preambles the Court rejected previously.  Upon review of Mr. York's report and the relevant citations to his report in the Anticipation Chart, the Court finds SANSI has established through clear and convincing evidence that Dry discloses the elements same way as the four claims identified above.  Therefore, the Court holds that Claim 15 of the '807 Patent and Claims 1, 12, and 17 of the '923 Patent are invalid as anticipated.

### f.  Dependent Claims

Next, the Court turns to the dependent claims.  Claim 17 (dependent on Claim 14) of the '807 Patent and Claim 18 (dependent on Claim 15) of the '608 Patent include the limitation that the first and second LEDs are in "thermal communication with the member and configured to transfer heat to the member."  (*Id.* at 25, 38.)  Claim 18 of the '608 also adds that the heat is transferred to member by conduction.  (*Id.* at 25; *see also* Doc. 68 at 20–21.)  SANSI relies on Mr. York's report where he opined that Dry teaches that heat generated by the LEDs is transferred to the thermally conductive member and into the channel to the medium (air) within the channel for dissipation.  (Doc. 110-1 at 79–81 ¶¶ 1163–69, 201 ¶ 1535–39, 208 ¶¶ 1560–63.)  It is evident that Dry discloses LEDs in thermal contact with the member, in which heat transfers to the channel through contact or conduction—after all, heat dissipation is one of the main purposes of the invention.  (*See id.* at 43.)  LDG has failed to refute this evidence.  Therefore, the Court finds Claim 17 of the '807 Patent and Claim 18 of the '608 Patent invalid as anticipated by Dry.

Claim 16 (dependent on Claim 15) of the '608 Patent and Claim 18 (dependent on Claim 17) of the '923 Patent add a limitation requiring the second side of the channel to be opposite of the first.  (*See id.* at 25.)  Consistent with the analysis above regarding LEDs on opposite sides, and Mr. York's opinion, the Court finds both claims anticipated by Dry.  (*See id.* at 175 ¶ 1447–50, 200 ¶ 1528–30.)

Dry also anticipates Claim 3 (dependent on Claim 1) of the '923 Patent, which adds the limitation that the light fixture has LED receiving surfaces disposed partially around the channel. (*Id.* at 13.) Mr. York opined that Dry's has printed circuits on the exterior surface where LEDs attach around the channel. (*Id.* at 68–69 ¶¶ 1137–45, 147 ¶ 1357.) As referenced by Mr. York in the figures below, Dry teaches a configuration with LEDs around the channel on the member, in which the LEDs are attached to a receiving surface, i.e., the printed circuits or the portions of the exterior surface in which the printed circuits attach.



(*Id.*) LDG fails to present any evidence to dispute Mr. York's opinion on these receiving surfaces and configurations. In fact, Dr. Katona's findings support that Dry teaches that a plurality of lights are mounted along and around the member or on printed circuits. (*See* Doc. 128–1 at 13–14.) Therefore, the Court finds that Dry anticipates Claim 3 of the '923 Patent.

Claim 15 (dependent on Claim 12) of the '923 Patent adds a limitation that the heat generated by the LEDs is transferred to the member by conduction, and then convection transfers the heat from the member. (*Id.* at 13.) As previously discussed, Dry teaches that heat is transferred through the member to the channel via conduction, therefore the Court addresses removal of the heat via convection. Mr. York opined that Dry discloses heat dissipating from the elongated member using a cooling medium, like air, through the channel. (*Id.* at 79–86 ¶¶ 1163–77, 168 ¶¶ 1421–26.) Mr. York also noted that Dry expressly provides from "convection cooling by flow of air through [the] tubular heat

sink," such that cool air enters one aperture and exits through the other.  (*Id.*)  Like with the other claims, LDG has failed to dispute this evidence.  Therefore, and as highlighted by Mr. York, the Court finds that Dry anticipates Claim 15 of the '923 Patent.

Claim 5 (dependent on Claim 1) of the '923 Patent is the only Challenged Claim providing for a limitation that describes the member having a "**[A]** core region extending centrally along at least a portion of the channel; **[B]** and one or more finds extending radially outwards from the core region."  (*Id.* at 13.)  Mr. York opined that Dry teaches this "core region" as it discloses an "interior cavity" that includes "one or more heat dissipating fins" of varying shapes.  (Doc. 110-1 at 146–48 ¶¶ 1359–65.)  Mr. York's opinion addresses element **[A]** but does not specifically opine on element **[B]**.  In reviewing Dry, the Court notes that it appears to disclose fins taking on a "triangular shape, but may take on other shapes."  (*Id.* at 44.)  Dry also indicates that the fins are "integrally formed on the interior of [the] elongated heat sink" and "may vary in number or location depending on the particular LED layouts or wattage."  (*Id.*)  With this in mind, it is not clear to the Court that the fins as disclosed in Dry necessarily disclose the fins in the same way as Claim 5 of the '923 Patent.  To find otherwise, the Court would have to read into the ambiguity of Dry that it discloses fins extending outward from the core region.  The parties to not adequately address or argue this issue in their briefings.  Therefore, the Court finds this issue is better left for the jury to decide and declines to find Claim 5 of the '923 Patent as anticipated by dry.  *See Net MoneyIn*, 545 F.3d at 1370.

Claims 7 and 9 (dependent on Claim 1) and Claim 10 (dependent on Claim 9) of the '923 Patent address limitations generally relating to the configurations for asymmetrical light output.  (Doc. 110-1 at 13, 152–55 ¶¶ 1378–85; *see also* Doc. 110-2 at 12.)  As Mr. York pointed out, Dry provides that the printed circuits have LEDs "mounted to it in a variety of orientations ranging from 360 degrees to 180 degrees and possibly others."  (Doc. 110-1 at 44, 153 ¶ 1380.)  Mr. York opined that based these teachings for variable light configurations, a person of ordinary skill in the art would understand that arranging all of the LEDs on one side of the member would lead to asymmetric light output.  (*Id.*

at 154 ¶ 1381.)  Mr. York further opined that for Claim 9 of the '923 Patent, Dry discloses that each printed circuit provides for a receiving surface, in which LEDs can be placed on each providing for various configurations and allowing for different optical distributions. (*Id.* at 156–60 ¶¶ 1386–94.)  Finally, Mr. York opined that for Claim 10 of the '923 Patent, Dry discloses receiving surfaces that are on the outer surface of the interior surface of the member.  (*Id.* at 160–62 ¶¶ 95–99.)

In maintaining its production of refuting evidence, or lack thereof, LDG does not address this evidence, nor did Dr. Katona address any of these three claims in relation to Dry.  (*See* Doc. 128-1 at 41–42.)  The Court agrees with Mr. York's analysis in part and finds that Dry discloses the limitations contained in Claims 7 and 9 of the '923 Patent. Dry's disclosure of various configurations and placements of LEDs to facilitate varying emittance of light, symmetrically or asymmetrically, covers those Claims' limitations.  To the Court however, it is not clear in the evidence presented that Dry anticipates the limitations in Claim 10 of the '923 Patent.  Mr. York's reasoning on the claim seems to duplicate his analysis for the other two claims.  For those two claims, Mr. York appears to opine that Dry discloses LEDs on out outer surface of the elongated member and all of the figures as annotated thus far show the same.  But the limitation in Claim 10 of the '923 Patent provides for receiving surfaces that "are provided on an outer surface of the interior surface."  Whether this means the surface within the member, i.e., placement of LEDs within the channel, or the outer surface of the member itself, is not entirely clear.  The limitation does not reference the inner surface of the member generally, instead it specifies the outer surface of the inner surface.  It seems entirely redundant to refer to the exterior surface of the member as the inner surface's outer surface.  Conceptually then, although the term "outer" could suggest outside of the member, here it could suggest outside the inner surface but still within the member.  SANSI did not adequately present clear and convincing evidence on this matter.  Without further development the Court cannot conclude either way.  Therefore, the Court finds that SANSI failed to produce clear and convincing evidence that Dry anticipates Claim 10 of the '923 Patent.  SANSI did,

1  however, adequately establish that Dry discloses the limitations in Claims 7 and 9 the '923

2  Patent, and as such the Court holds they are invalid as anticipated.

3          *g.  The Co-Planar Limitation*

4       The parties dispute the "co-planar" limitation contained in Claim 2 of the '923

5  Patent, which as discussed, depends on Claim 1 with the limitation that the at least one

6  LED is position on opposite sides of the channel.  (Doc. 109 at 11–13; Doc. 127 at 12–13;

7  Doc. 138 at 5–6; *see also* Doc. 110-1 at 13.)  SANSI relies on Mr. York's report, where he

8  opined that Dry discloses this limitation.  (*See* Doc. 110-1 at 145–47.)  Mr. York's report

9  presents two theories that has caused some confusion.  First, LEDs are co-planar where

10  they are positioned on the exterior surface on a particular plane, i.e., the same printed circuit

11  along a single side.  (*See id.* at 145–47 ¶¶ 1349–54.)  But this theory does not address

12  co-planar LEDs on *opposite* sides of the elongated member as annotated by Mr. York in

13  the figure below.



FIG. 3

24  (*See id.*)  Second, Mr. York addressed a configuration based on LDG's arguments that

25  LEDs are co-planar when they are positioned on the member such that they share a plane

26  parallel to the member's base.  (*See id*.)  Mr. York opined that it would be apparent to a

27  person skilled in the art that Dry discloses arrangements of LEDs on the plane in the first

28  theory, and LEDs dispersed on other side of the member, in which those LEDs are similarly

situated on that side's plane.  (*Id.*)  Mr. York orientated Dry by characterizing the planes on two sides of the member as "first and third vertical plane[s]" and a second set of planes on other sides as a "second and fourth vertical plane."  (*Id.*)  Mr. York explained that, based on his orientation, at least one LED on the first vertical plane and the LED opposite the first on the third vertical plane are co-planar because they fall on a "cross-sectional plane," and the same would be true for the second set of sides with LEDs opposite one another. (*Id.*)

LDG takes issue with Mr. York's annotation on the figure above showing LEDs that are vertically co-planar.  (*See* Doc. 127 at 12.)  LDG, however, misunderstands the LEDs depicted relate to Mr. York's first theory, and that he separately explained the other vertical plane with LEDs opposite the first (and located behind the first vertical plane depicted).

LDG also criticizes Mr. York for "imagining" co-planar LEDs opposite one another because he reasoned that, based on the figure above and the cross-sectional figure of Dry indicating LEDs on opposite sides, *see* Section III(A)(4)(e) (Figure 2), the LEDs on the second plane are aligned as to displace half the distance between the LEDs on the first plane.  According to LDG, "it is well established that patent drawings do not define the precise proportions of the elements," and reliance on the apparent displacement was improper.  (*Id.* at 13 (alteration omitted) (citing *Nystrom v. TREX Co.*, 424 F.3d 1136, 1149 (Fed. Cir. 2005)).)  But as SANSI notes, *Nystrom* is not relevant and factually distinguishable.  (Doc. 138 at 6.)  There, the patent at issue related to curved floorboard with a specific thickness-to-width ratio.  *Nystrom*, 424 F.3d at 1139, 1148.  The defendant argued anticipation by using drawings in prior art to develop a software model to generate modeled boards with the curvature and width-to-thickness ratio.  *Id.* at 1148–49.  The Federal Circuit reversed grant of summary judgment because the district court found anticipation based on speculative drawings to define the precise ratio claimed.  *Id.* at 1149.

There is no dispute that Claim 2 of the '923 Patent, nor Claim 1 of the '923 Patent for which it depends, does not require a precise location for the LEDs.  (*See, e.g.* Doc. 128 at 12 ¶¶ 45–46.)  Mr. York opined to a narrower limitation not contained in the claim,

believing that LDG was arguing that co-planar meant that the LEDs had to be opposite, and that cross-sectional plane had to run parallel to the base of the member. Based on the parties' arguments, however, the plane running in relation to the base is not necessary. Without this precise limitation, Mr. York's opinion on the matter is simply dressing on top of his analysis and not grounds to create a dispute of fact. As Mr. York has reasoned, Dry discloses LEDs on opposite sides of the elongated member capable of being mounted along the printed circuit in varying configurations. The common sense meaning of "co-planar" means on the same plane, and it is a matter of simple geometry that two points in a space will always lie on the same plane. It does not take a creative or scientific imagination to understand Dry teaches this limitation. The Court finds that Dry discloses a light fixture with co-planar LEDs positions on opposite sides of a member. Therefore, the Court holds Claim 2 of the '923 Patent is anticipated by dry and invalid.

As a final matter on the "co-planar" issue, Claim 13 of the '923 Patent also contains a limitation that the first LED is positioned co-planar to the second LED. (Doc. 110-1 at 13.) This claim, however, is dependent on Claim 12 of the '923 Patent and does not require placing the LEDs opposite one another, just adjacent. (*See id.*) For the reasons the Court has stated previously, Dry discloses LEDs placed adjacent one another and co-planar and Mr. York has adequately opined as much. (*See id.* at 167–68 ¶¶ 1418–20.) Additionally, as the co-planar limitation does not require that a particular plane run parallel to the base of the member, the figures tend to show LEDs positioned on adjacent portions of the channel or member, which appear to be co-planar in a manner that the plane does not run parallel to the base. The Court finds that, consistent with the prior analysis demonstrating Dry discloses LEDs in various configurations along various sides, the limitation on the placement of lights in Claim 13 of the '923 Patent is disclosed by Dry. Therefore, the Court holds that the claim is invalid as anticipated by Dry.

### B. Limitations on Damages

Both parties' Motions relate to the applicability of 35 U.S.C. § 287. (*See* Doc. 107; Doc. 109.) Infringement damages are generally limited to period of six years before filing

suit.  35 U.S.C. § 286.  Section 287(a), however, provides limits on damages that occur prior to notice of infringement.  Section 287(a) provides:

> Patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them . . . may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent . . . .  *In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice.*

(Emphasis added.)  "The patentee bears the burden of pleading and proving he complied with § 287(a)'s marking requirement." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.* (*Arctic Cat I*), 876 F.3d 1350, 1366 (Fed. Cir. 2017); *see also Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1446 (Fed. Cir. 1998) (applying a preponderance of the evidence standard).  Compliance here is a question of fact.  *Arctic Cat I*, 876 F.3d at 1366.  "If a patentee who makes, sells, offers for sale, or imports his patented articles has not 'given notice of his right' by marking his articles pursuant to the marking statute, he is not entitled to damages before the date of actual notice." *Id.* (quoting *Dunlap v. Schofield*, 152 U.S. 244, 248 (1894)).

Actual notice occurs with "affirmative communication of a specific charge of infringement by a specific accused product or device." *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.* (*Arctic Cat II*), 950 F.3d 860, 864 (Fed. Cir. 2020) (quoting *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994)).  On the other hand, constructive notice occurs where a patentee marks its products. *Id.* (affirming summary judgment barring pre-suit damages where the patentee licensed a patented product expressly providing the licensee with no obligation to mark).  Once a patentee or licensee begins selling a patented article, the notice requirement attaches. *Id.* at 864–65 (rejecting the patentee's argument that the licensee cessation of selling unmarked products made pre-suit damages available for periods where no products were sold).  The Federal Circuit has recognized that "it may be difficult for a patentee to ensure his licensees' compliance with the marking provisions," therefore "courts may consider 'whether the

1    patentee made reasonable efforts to ensure compliance with the marking requirements.'"

2    *Arctic Cat I*, 876 F.3d at 1366 (quoting *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111–12

3    (Fed. Cir. 1996)).   As the Federal Circuit explained, marking (1) helps avoid innocent

4    infringement; (2) encourages patentees to provide public notice of the article is patented;

5    and (3) aids the public in identifying patented articles.   *Id.* (noting that selling unmarked

6    products "misleads others into believing they are free to make and sell an article actually

7    covered by [a] patent").   The inquiry is not into what the alleged infringer knew, but rather

8    whether the patentee's actions were sufficient under the circumstances to provide notice.

9    *Nike*, 138 F.3d at 1446.

10       The parties' competing Motions on the applicability of § 287, or lack thereof,

11   present the Court with a concoction of issues addressed in turn.

12                              1.   <u>LDG's Motion</u>

13       LDG argues that § 287's marking requirements are inapplicable up to at least May

14   25, 2020 when LDG entered into a license for the Asserted Patents with a third-party, GE

15   RUN.   (Doc. 107 at 13–15.)   According to LDG, *Arctic Cat II* does not preclude it from

16   recovering damages for the period before marking obligations are triggered.   (*Id.* (citing

17   *Arendi S.A.R.L. v. LG Elecs., Inc.*, No. C.A. 12-1595-LPS, 2022 WL 22400977, at *8 (D.

18   Del. Mar. 31, 2022); *WiAV Sols. LLC v. Motorola, Inc.*, 732 F. Supp. 2d 634, 639–40 (E.D.

19   Va. 2010)).)   Therefore, LDG appears to contend that § 287 does not preclude recovering

20   damages occurring before May 26, 2020, nor damages occurring after it provided SANSI

21   with actual notice of the infringement on June 26, 2020 (the "Letter").   (*Id.* at 16.)[7]

22       SANSI replies that LDG failed mark its products as required under § 287(a), thus

23   limiting the recoverable damages to scope of the Letter.   (Doc. 124 at 11.)   SANSI argues

24   the Letter only covers specific charges of infringement by the specific products identified.

25   (*Id.* (citing *Amsted*, 24 F.3d at 187).)   SANSI expounds the Letter specifically identified

26

27   _____
     [7]  LDG anticipatorily addresses SANSI's response and asserts that "§ 287 does not apply
28   at all."   (*Id.* at 16 n.2.)   However, this line of argument seems at odds with its theory on
     damages under § 287, where damages are essentially unavailable from May 25 to June 26,
     2020.

only twelve products[8] allegedly infringing on the Asserted Patents (the "corn lights"), and LDG only later identified additional lights in its initial Complaint (the "second set of products") and identified the corn lights and one of the products from the second set of products as infringing its '608 Patent.[9]  (*Id.* at 12; *see also* Doc. 1 at 1 ¶¶ 35–38, 47, 56; Doc. 18 at 83.)  Accordingly, SANSI trifurcates the dates for when it received actual notice of infringement into June 26, 2020, when it received notice for the corn lights, August 31, 2022, when it received notice the second set of products identified in the initial Complaint, and January 18, 2023, when it received notice of the '608 Patent allegations in the Amended Complaint.  (*Id.* at 12.)  As such, SANSI claims it is insufficient to say that it had actual notice of infringement on June 26, 2020 for all of the products.  (*Id.*)  SANSI further takes issue with what it views as LDG suggesting that in the case of a failure to mark, the licensing date provides the starting point for damages and § 287 does not bar recovery of all damages prior to actual notice.  (*Id.* at 13–16.)  SANSI rejects *Arendi* and *WiaV*, arguing there is a split of authority on the issue, and the plain meaning of § 287 supports the proposition that when a failure to mark occurs, all pre-actual notice damages are barred under § 287.  (*Id.*)

In reply, LDG clarifies that the corn lights referenced in the Letter undisputedly refer to (1) the at least twelve products as groups; (2) the Letter included attached claim charts that were "non-limiting representative examples of infringement" within a product

---

[8]  Those products include "Sansi C21BB-WE Omnidirectional Light Bulb, Sansi C21BB-TE26 UV Light Bulb, Sansi C21BB-QE Smart RGB Light Bulb, Sansi C21BB-TE26/27 Plain Light Bulb, Sansi C21BB-RE Dimmable Light Bulb, Sansi C21UBBE - Light Bulb, Sansi C21GL-CE26/27 Full Spectrum Glow Light, Sansi C21GL-AE26 Full Cycle Glow Light, Sansi C21GL-DE26 Full Spectrum Glow Light, Sansi C21GL-CE26/27 Full Spectrum Glow Light, Sansi C21GL-AE26-Flowering Glow Light, Sansi C21BB-ZE39/E40 High Bay Light, and BR30 Non-Dimmable LED Light Bulb." (Doc. 110-2 at 73.)  LDG indicated that the first five characters, e.g., "C21BB" identify the product model, of which can contain numerous product groups within the C21BB "family, e.g., "C21BB-WE" and "C21BB-TE." (Doc. 139 at 13.)
[9]  The second set of products in the initial Complaint include "C21BB-VE26-18W" (a 2500 lumens "A21 LED bulb"), "C21GL-CE26-24W" (an "LED grow light"), an "Omni-Directional Ceramic LED bulb (a 4000 lumens A21 LED bulb), an "adjustable head clip-in LED grow light," and "C21BB-02E26-35" (a 6500 lumens A21 LED bulb). (*See* Doc. 1 ¶¶ 35–38, 47, 56.)  LDG's initial Complaint did not allege the corn lights nor the second set of products infringed on its '608 Patent.  LDG amended its Complaint to include allegations that the corn lights and one of the A21 LED bulbs (product number C21BB-02E26-35) infringed its '608 Patent. (*See* Doc. 18 ¶ 83.)

family; (3) the parties stipulated to nine representative product groups, including those of the "C21BB family" not initially included in the Letter; and (4) SANSI responded to the Letter on August 27, 2020 purportedly conceding that the Letter applied to more than the corn lights identified in the notice.  (Doc. 139 at 12–13 & n.3; Doc. 139-2 at 3, 5 n.1; Doc. 139-3 at 2–3; Doc. 139-4 at 2–4.)  LDG argues Federal Circuit case law supports that a notice letter may provide notice as to multiple products not specifically listed.  (*Id.* at 13 (citing *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1347 (Fed. Cir. 2001); *Funai Elec. Co. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1373 (Fed. Cir. 2010)).)  LDG also refutes SANSI's argument that *Arendi* was incorrectly decided by arguing *Arctic Cat II* does not preclude damages pre-dating May 25, 2020.  (*Id.* at 14–15.)  LDG concludes that the Letter provided actual notice for all Accused Products, thus LDG may seek pre-suit damages for all of them.  (*Id.*)

### 2. SANSI's Motion

SANSI moves for summary judgment on the issue that LDG failed to mark its patented article under § 287(a), and thus not entitled to certain pre-suit damages for the six-year period prior to LDG filing this lawsuit.  (Doc. 109 at 13.)  SANSI contends its potential liability is limited only to infringement that occurred after it received notice of the alleged infringement— and in its view, occurring at the earliest on June 26, 2020.  (*Id.* at 14.)  SANSI offers LDG's prior licenses that did not require third-party licensees to mark product sold under the license as proof of the alleged failure to mark.  (*Id.* at 14–15.)  According to SANSI, it put LDG on notice of its failure to mark on July 24, 2023, which in turn placed the burden on LDG to comply with § 287.  (*Id.* at 15–16.)[10]  And as such, LDG's refutation to SANSI's interrogatory that SANSI has not provided any evidence of products actually sold under those licenses to trigger § 287 requirements is insufficient because it is LDG's burden to show no products were sold.  (*Id.* at 16 (citing *Arctic Cat I*, 876 F.3d at 1368).)

---

[10]  SANSI notes that the record reflects inconsistent but immaterial references to this date as July 28, 2023.  (*Id.* at 15 n.7.)  Because the date is not in dispute and immaterial, the Court accepts July 24, 2023 as indicated in the letter at issue.  (*See* Doc. 110-2 at 76.)

LDG responds that dispute boils down to the difference between a one-month period. (Doc. 127 at 15–17.) LDG argues the earliest license date that could trigger § 287 is May 25, 2020, but even then, SANSI has failed to carry its burden in establishing patented products were sold or offered for sale by the licensees. (*Id.* at 18–19.) According to LDG, SANSI's July 24, 2023 letter was insufficient because it merely provided links to websites accessed around that time without indicated those links were available in May or June 2020. (*Id.* at 18.) LDG expounds that nearly all of the links direct the user to webpages outside of the United States, and the two links that direct traffic to United States-based websites show the products are currently unavailable. (*Id.* at 18–19.) LDG concludes that SANSI has failed to show that the patented articles were sold or offered to sale before June 26, 2020 when SANSI received notice of the alleged infringement. (*Id.* at 18–20 (citing *Oracle Am., Inc. v. Google, Inc.*, No. 10-cv-3561, 2011 WL 5576228, at *2–3 (N.D. Cal. Nov. 15, 2011); *MobileMedia Ideas, LLC v. Apple Inc.*, 209 F. Supp. 3d 756, 763 (D. Del. 2016)).)

SANSI replies that the burden is a low bar and identifying products that it "believed" triggered § 287 was sufficient. (Doc. 138 at 10.) SANSI also argues that *Artic Cat I* overruled the cases that LDG relies on and only requires them to identify allegedly unmarked products. (*Id.* at 11.) SANSI contends that the licenses authorize sales in United States channels, including on Amazon.com, and listing the products online constitutes offering for sale. (*Id.* at 12.) In its view, suggesting that the licensees listed the products online and immediately making them unavailable defies common sense and is absurd. (*Id.*) SANSI concludes because LDG has made no effort to mark, there is no reason to excuse its failure. (*Id.* at 12–13 (citing *Maxwell*, 86 F.3d at 1111–12).)

### 3. Marking

The Court first addresses the applicable burdens on the parties. The Federal Circuit has established a low bar for SANSI to meet its burden in putting LDG on notice of its failure to mark. *See Artic Cat I*, 876 F.3d 1368. An alleged infringer bears the initial burden to challenge § 287 compliance by articulating products it believes are unmarked

patented articles. *Id.* Notably, "[t]he alleged infringer's burden is a burden of production, not one of persuasion or proof." *Id.* Underpinning this low bar is the fundamental requirement that "[t]he burden of proving compliance with marking is and at all times remains on the patentee." *Id.* at 1367–68 (cautioning against permitting infringers to embark on a fishing expedition but noting patentees are in a unique position to identify the products that practice the patents at issue).

SANSI's notice to LDG pointed out specific listings for specific unmarked products it believed were practicing the Asserted Patents and listed for sale online by LDG's licensees within the United States. (*See* Doc. 110-2 at 76–78, 85–86.) LDG attempts to refute that SANSI has met its burden by arguing that SANSI accessed the websites at the time it provided notice, not at the time of the failure to mark. (Doc. 127 at 17–20.) However, LDG conceded at oral argument that it is not entitled to damages between May 25, 2020 and June 26, 2020 when it provided actual notice to SANSI, thus the Court finds LDG waived the argument that it is entitled to damages for that period.

The Court now turns to the extent LDG may recover damages prior to that date.

Generally, a patentee who never makes or sells a patented article does not trigger § 287's requirements. *Artic Cat II*, 950 F.3d at 864 (citing *Wine Ry. Appliance Co. v. Enter. Ry. Equip. Co.*, 297 U.S. 387, 397 (1936)). However, the Federal Circuit has also expounded:

> [A] patentee who never makes or sells a patented article may recover damages even absent notice to an alleged infringer. *If, however, a patentee makes or sells a patented article and fails to mark in accordance with § 287, the patentee cannot collect damages until it either begins providing notice or sues the alleged infringer—the ultimate form of notice—and then only for the period after notification or suit has occurred.* Thus, a patentee who begins selling unmarked products can cure noncompliance with the notice requirement—and thus begin recovering damages—by beginning to mark its products in accordance with the statute.

*Id.* (emphasis added) (requiring licensees to also comply).

SANSI asks the Court to join its sister courts in holding that failure to comply with the marking requirements after attachment cuts off all pre-notice damages, not just those arising after, as consistent with *Arctic Cat II* (*see* Doc. 14 at 13). *See, e.g., Adrea, LLC v.*

*Barnes & Noble, Inc.*, No. 13-CV-4137 (JSR), 2015 WL 4610465, at *3 (S.D.N.Y. July 24, 2015); *Team Worldwide Corp. v. Academy Ltd.*, No. 2:19-CV-00092-JRG-RSP, 2021 WL 1854302, at *2 (E.D. Tex. May 10, 2021), *adopted by* 2021 WL 1985688 (E.D. Tex. May 18, 2021); *Unicorn Energy AG v. Tesla Inc.*, No. 21-CV-07476-BLF, 2024 WL 3463356, at *23 (N.D. Cal. July 17, 2024).

LDG asks the Court to reject those cases and follow *Arendi*'s, where the Delaware district court concluded *Arctic Cat II* does not preclude recovery of damages for periods before the marking obligation attached. *See also WiAV*, 732 F. Supp. 2d at 638–40 (rejecting a defendant's interpretation of § 287 that essentially "penalizes the patentee for failing to comply with a statute that the patentee was not required to comply with in the first place" because it was contrary to the statute's purpose). In *Arendi*, the court took a narrow view of *Arctic Cat II*'s holding, finding that the patentee had not authorized the unmarked sales, nor did it fail to remedy prior noncompliance. *See* 2022 WL 22400977, at *8 & n.10 (disagreeing with *Team Worldwide*). In fact, the license at issue was born out of the patentee accusing the soon-to-be licensee of infringement and the settlement and licensing agreement that followed. *See id.* at *6–8. In plain terms, *Arendi* stands for the proposition that the unauthorized sale of allegedly infringing products did not give rise to a patentee's obligation to mark those unauthorized products. The factual circumstances in *Arendi* where the purported triggering event had nothing to do with the patentee's actions are distinguishable from the facts of this case. It is undisputed that LDG licensed the patents-in-suit to GE RUN under a license void of any obligation to mark and the offers for sale happened under that license. (Doc. 128 at 12 ¶ 48.)[11]

The Court tends to agree with *Unicorn Energy*'s interpretation of § 287. *See* 2024 WL 3463356, at *23. The statute provides that "*in the event of failure so to mark*, *no damages shall be recovered by the patentee* in any action for infringement *except on proof that the infringer was notified* of the infringement and continued to infringe thereafter, *in*

---

[11]  The parties also address a second license LDG executed with "Auzer" on June 7, 2020 which similarly did not include any marking requirements. (*Id.* at 13 ¶ 50.) But because the GE RUN license predates that license, and LDG primarily argues the applicability of the GE Run license date, the Court focuses its analysis accordingly.

*which event damages may be recovered only for infringement occurring after such notice*."
§ 297(a) (emphasis added).  Under a plain reading, § 287(a) precludes recovery after the
requirement to mark is triggered until actual notice is given, after which that date then
controls the starting date for recovery.  Although this is a harsh result, the plain language
controls.[12]

This construction is consistent with prior Federal Circuit case law.  The Federal
Circuit has stated "Congress structured the statute so as to tie failure to mark with disability
to collect damages."  *Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1537 (Fed.
Cir. 1993).  In *American Medical Systems*, the district court construed § 287 to preclude
pre-suit damages where the patentee had allowed for shipment of more than a *de minimus*
amount of unmarked protheses and found the time of filing suit provided actual notice.  *See
id.* at 1534–35, 1537–38.  The patentee had obtained the patent for the protheses but did
not begin marking until about two months later and did not begin shipping marked
protheses until about over three months after the patent issued.  *Id.* at 1534.  During the
period after the patent issued, the patentee shipped some unmarked protheses while it began
the marking process.  *Id.* at 1534–35.  The Federal Circuit ultimately held that the district
court's interpretation was incorrect, concluding § 287 "precludes recovery of damages for
infringement for any time prior to compliance with the marking or actual notice
requirements of the statute."  *Id.* at 1537.  The court further adopted an interpretation that
marking compliance requires that once marking has begun, "it must be substantially
consistent and continuous in order for the party to avail itself of the constructive notice
provisions of the statute."  *Id.* at 1537–38 (noting once compliance is met, the public is on
notice and "there is no reason to further limit damages on this account").  Notably,
however, the court did not permit back-dating compliance based on the date the patentee
began marking its protheses because it had yet to ship the marked goods, which would
provide the public with constructive notice.  *Id.* at 1537–38.

In reaching its holding, the *American Medical Systems* court reasoned that, although

---

[12]  The Court finds *WiAV* unpersuasive for this same reason.  *See* 732 F. Supp. 2d at 638–40
(finding the purpose controlled the interpretation without evaluating the plain language).

§ 287's statutory predecessor placed an affirmative duty to mark upon a patent issuing, "Congress structured the [current] statute so as to tie failure to mark with disability to collect damages, not failure to mark at the time of issuance with disability to collect damages." *Id.* at 1536–37 & n.15; *cf.* 35 U.S.C. § 287(a) (using the permissive "[p]atentees . . . *may* give notice to the public" (emphasis added)).  As the court explained, "allowing recovery of damages from the point of full compliance with the marking statute furthers the policy of encouraging marking to provide notice to the public, even if initial marking after issuance of the patent is delayed.  *The sooner one complies with the marking requirements, the more likely one is to maximize the period of time for recoverable damages.*"  *Am. Med. Sys.*, 6 F.3d at 1537 (emphasis added).

The Federal Circuit subsequently reiterated that "[a] patentee who makes, uses, or sells its own invention is obligated to comply with the marking provisions to obtain the *benefit* of constructive notice."  *Maxwell*, 86 F.3d at 1111 (emphasis added); *see also Funai*, 616 F.3d at 1375 (discussing *Maxwell* and *American Medical Systems*).  In *Maxwell*, the court expounded on *American Medical Systems* in holding that where third parties effectuate a sale, the "rule of reason" allows the court to consider whether the patentee "made reasonable efforts to ensure compliance with the marking requirements."  86 F.3d at 1111–12 (reasoning, with regard to third-party sales, the number of unmarked products is not conclusive of whether a patentee's marking was "substantially consistent and continuous").  The court reasoned that third parties pose a difficult challenge to patentees to ensure compliance and permitted "substantial compliance" under the rule of reason.  *Id.* At this point, it is evident that the Federal Circuit viewed entitlement to pre-suit damages under a constructive notice theory as a benefit and not affirmative right absent compliance. *See, e.g.*, *id.* at 1111; *SRI Int'l, Inc. v. Advanced Tech. Lab'ys, Inc.*, 127 F.3d 1462, 1470 (Fed. Cir. 1997) ("Absent marking, damages may be recovered only after actual notice is given."); *Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*, 853 F.3d 1370, 1383 (Fed. Cir. 2017) ("The marking statute protects the public's ability to exploit an unmarked product's features without liability for damages until a patentee provides either

1    constructive notice through marking or actual notice." (citing *Bonito Boats, Inc. v. Thunder*
2    *Craft Boats, Inc.*, 489 U.S. 141, 162 (1989))).

3           As discussed, there is no longer an affirmative duty to mark after a patent issues,
4    but if a patentee seeks to avail itself of the benefits of constructive notice to the public, i.e.,
5    availability of pre-suit damages after an offer for sale of its patented products, it may do so
6    through complying with § 287's marking requirements.  *See, e.g.*, *Maxwell*, 86 F.3d
7    at 1111; *Am. Med. Sys.*, 6 F.3d at 1537; *Rembrandt*, 853 F.3d at 1383.  This is simply not
8    the case where LDG never triggered § 287(a).  Thus, the Court finds LDG is barred from
9    recovering damages for alleged infringing products in which it failed to provide actual
10   notice to SANSI and will deny LDG's Motion on this issue but grant SANSI's Motion to
11   the extent it is consistent with the actual notice issue below.

12                            4.  Actual Notice

13          Actual notice requires a letter to "be sufficiently specific to support an objective
14   view that the infringer may be an infringer."  *Funai*, 616 F.3d at 1373.  "The letter must
15   communicate a charge of infringement of specific patents by a specific product *or group*
16   *of products*."  *Id.* (emphasis added); *see also Amsted*, 24 F.3d at 187 (noting that it is
17   irrelevant to the actual notice inquiry whether the accused infringer knew of the
18   infringement).  "However, when the threshold specificity is met, the ensuing discovery of
19   other models and related products may bring those products within the scope of the notice."
20   *Funai*, 616 F.3d at 1373.  "[W]hether the patentee's communication provides 'sufficient
21   specificity' regarding its belief that the recipient may be an infringer cannot take into
22   consideration the knowledge or understanding of the alleged infringer, but must focus on
23   the action of the patentee."  *Gart*, 254 F.3d at 1346 (quoting *Amsted*, 24 F.3d at 187).
24   Where "the communication from the patentee provides sufficient specificity regarding its
25   belief that the recipient may be an infringer, the statutory requirement of actual notice is
26   met."  *Id.* (citing *SRI Int'l*, 127 F.3d at 1469).  The communication should also include a
27   "proposal to abate the infringement, whether by license or otherwise."  *SRI Int'l*, 127 F.3d
28   at 1469.

SANSI's attempt to highlight specific products identified in the initial Complaint and Amended Complaint is unavailing to create a dispute of fact on the issue of whether it received actual notice via the Letter as to the later asserted products. The Letter expressly indicated that LDG believed SANSI's products infringed the Asserted Patents, provided the claim charts detailing its allegations related to those specific products, acknowledged the products were representative, provided an example of a products within a family of products that would allegedly infringe in the same way, and offered a licensing opportunity to abate infringement. (*See* Doc. 139-2 at 3, 5 n.1; Doc. 139-4 at 2–4.) In response to the Letter, SANSI's counsel noted receipt of the Letter occurring on June 26, 2020, listed the Asserted Patents, indicated that he had reviewed the Letter and the claim charts accompanying it, and asserted that SANSI's "products most likely do not infringe" and finding a license was unnecessary. (Doc. 139-3 at 2–3.) SANSI does not dispute that the Letter provided notice for the corn lights, and seemingly concedes that it provided a specific charge of infringement and identified specific accused products. The evidence above establishes SANSI's objective understanding that it *may* be an infringer. *See, e.g.*, *Funai*, 616 F.3d at 1373. As such, LDG met the required threshold specificity. *Id.*

The Letter also covers the second set of products and new infringement allegations pertaining to the '608 Patent. *Funai* recognized that "ensuing discovery of other models and related products may bring those products within the scope of the notice." *Id.* While LDG did not have the benefit of discovery before adding the product from the C21BB family in its initial Complaint, SANSI has not created a genuine dispute that the Letter identified representative products among a group or family. *See, e.g.*, *K-TEC, Inc. v. Vita-Mix Corp.*, 696 F.3d 1364, 1379 (Fed. Cir. 2012) (finding actual notice was satisfied where a later-alleged product used the same item numbers as the product indicated in the notice letter and the alleged infringer treated the products as related). SANSI has not made any showing that the second set of products were not within the scope of the group of products identified in the Letter, which also identified the Asserted Patents, including the '608 Patent. The Court notes that SANSI raised the trifurcation issue in its Response to

LDG's Motion, (Doc. 124 at 12), and briefly again in its Reply supporting its Motion, (Doc. 138 at 9–10).  To the extent the Court views SANSI's assertions in its Reply as moving on the issue, viewing the facts in LDG's favor, its proffered evidence has raised a genuine dispute of fact that SANSI did receive notice for all products.  Regarding LDG's Motion, viewing the facts in SANSI's favor, for the same reasons, SANSI has not raised a genuine dispute of fact that it did not receive actual notice for all the alleged products later identified.  Further, LDG has aptly provided sufficient evidence to refute any purported dispute of fact, thus entitling it to summary judgment on this narrow issue.

Accordingly, the Court finds that LDG complied with § 287's actual notice requirement and may recover pre-suit damages accruing after June 26, 2020 but not for damages occurring before that date and will deny SANSI's Motion on this issue.

### C. Non-infringing Alternatives

LDG moves for partial summary judgment on what it considers an issue of whether SANSI can establish alleged non-infringing alternatives.  (Doc. 107 at 17–22.)  LDG argues that SANSI has failed to establish any evidence of non-infringing alternatives and that they were available for use.  (*Id.* (citing *Grain Processing Corp. v. Am. Maize-Prod. Co.*, 185 F.3d 1341, 1353 (Fed. Cir. 1999); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, No. 2:06-CV-348, 2011 WL 197869, at *3 (E.D. Tex. Jan. 20, 2011)); Doc. 139 at 15–16.)  LDG further contends that accused products cannot serve as a basis to prove existence of non-infringing alternatives.  (*Id.* (citing *Webasto Thermo & Comfort N. Am., Inc. v. BesTop, Inc.*, No. 16-CV-13456, 2019 WL 3334563, at *4 (E.D. Mich. July 25, 2019)).)

SANSI argues summary judgement is inappropriate on the issue, and even if it were, Mr. York rebuts Dr. Katona's findings regarding what constitutes a non-infringing alternative to create a genuine dispute of fact.  (Doc. 127 at 16–19.)  According to SANSI, Mr. York identified (1) various prior art that SANSI could have used, (2) one unaccused product, and (3) accused products as non-infringing alternatives, if found non-infringing.  (*Id.*)

The Court begins with a point of clarity—LDG has failed to cite the appropriate

applicable law. *Grain Processing* pertains to the standard applicable to non-infringing alternatives under a lost profits damages theory, not a reasonable royalty hypothetical negotiation. *See* 185 F.3d at 1353; *see also Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1393 (Fed. Cir. 2003) ("This court has not had occasion to address whether the holding of *Grain Processing* has applicability in the reasonable royalty context."). Further, LDG's reliance on *LaserDynamics* is unpersuasive. *See* 2011 WL 197869, at * 3 ("To be an acceptable non-infringing substitute, the substitute 'must be available or on the market at the time of infringement.'" (quoting *Grain Processing*, 185 F.3d at 1350)). Courts of that district have later clarified that "acceptable non-infringing alternatives" do not play the same role in a reasonable royalty analysis. *Salazar v. HTC Corp.*, No. 2:16-CV-01096-JRG-RSP, 2018 WL 2033709, at *3 (E.D. Tex. Mar. 28, 2018) ("Rather, courts consider the next-best available alternative, which is not necessarily an 'acceptable' alternative that precludes recovery of lost profits." (citation omitted)). Non-infringing alternatives in a lost profits analysis are particularly important because the patentee must prove damages "but for" the infringement. *See Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, No. 09-290, 2012 WL 3686736, at *4 (W.D. Pa. Aug. 24, 2012).

As courts in this district have recognized, and cited by LDG for support—albeit misplaced, "[n]oninfringing alternatives play a fundamentally different role in lost profit and reasonable royalty analysis." *Droplets, Inc. v. Yahoo! Inc.*, No. 12-CV-03733-JST, 2021 WL 9038509, at *10 (N.D. Cal. Apr. 27, 2021). In *Droplets*, the lost profits analysis requires showing a lack of non-infringing alternatives, but as the Court explained, the reasonable royalty analysis merely sets the damages floor to provide damages when exact losses are incalculable. *Id.* at *10–11. For a reasonable royalty, non-infringing alternatives are relevant to two of the fifteen *Georgia-Pacific* factors—they aid in valuing the invention and limit an infringer's willingness to pay in a hypothetical negotiation—but are otherwise not mandatory under the analysis. *Id.* As such, the court concluded neither party carries the burden to prove non-infringing alternatives or their absence because parties may rely on a variety of factors. *Id.* at *11. Therefore, *Droplets* seems to suggest the issue as LDG

1    presents is not amenable to summary judgement and is actually an issue of expert witness

2    credibility or methodology in opining on what would constitute a reasonable royalty. *See,*

3    *e.g.*, *RSB Spine, LLC v. DePuy Synthes Sales, Inc.*, No. CV 19-1515-RGA, 2022 WL

4    17084156, at *4 (D. Del. Nov. 18, 2022) (declining to exclude expert testimony and

5    rejecting plaintiff's argument that defendant has the burden of proof when considering

6    non-infringing alternatives under a reasonable royalty determination); *Inline Plastics Corp.*

7    *v. Lacerta Grp., Inc.*, 560 F. Supp. 3d 424, 437 (D. Mass. 2021) (finding a challenge to an

8    expert's analysis as to a reasonable royalty based on non-infringing alternatives capping

9    potential damages in a motion for summary judgment as premature and inappropriate);

10   *Schofield v. United States Steel Corp.*, No. 2:04-CV-520-PRC, 2006 WL 8452286, at *6

11   (N.D. Ind. Mar. 31, 2006) (similar). But that is not the Motion before the Court.

12           LDG harps on *Sherwin-Williams Co. v. PPG Indus., Inc.*, No. 17-1023, 2020 WL

13   1283465 (W.D. Pa. Mar. 18, 2020) to argue the issue is amendable to summary judgement.

14   (Doc. 139 at 15 & n.6, 16.)  In *Sherwin-Williams*, the court's analysis primarily pertained

15   to a lost profits issue, however, it also addressed non-infringing alternatives under a

16   reasonable royalty calculation. *See* 202 WL 1283465, at *9.  The court found that because

17   there was no evidence presented to support non-infringing alternatives existing at the time

18   of infringement summary judgment was appropriate. *Id.* at *8–10 (finding the expert failed

19   to quantify the impact of asserted non-infringing alternatives and allowing a jury to adjust

20   damages accordingly would cause confusion and invite speculation (citing Fed. R. Evid.

21   403)).[13]  The case turned on the absence of evidence and basic evidentiary principles.  The

22   hypothetical negotiation necessarily involves a prediction involving many variables and

23   evidence supporting those variables may be used where it is reliable, relevant, and not

24   unduly prejudicial. *See Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 771–72 (Fed.

25   Cir. 2014).

26           LDG    attempts    to    refute    SANSI's    proffered    non-infringing    alternatives    on

27

28   ---
     [13]  LDG also cites *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, No. 1:11-CV-871, 2019
     WL 2164090, at *12–13 (S.D. Ohio May 17, 2019), however, that case addresses the
     burdens related to lost profits and is not applicable here.

evidentiary grounds.  First, LDG argues prior art reference are insufficient non-infringing alternatives because Mr. York's opinion invites speculation.  (Doc. 107 at 18–19.)  Mr. York opined that the prior art teaches effective heat management and dissipation using heat sinks and convection.  (Doc. 90-21 at 9.)  Mr. York further opined that with advancements in the thermal efficiency of LEDs, the need significant heat dissipation in the prior art were diminished, which reflects the commercial availability of non-infringing alternatives both in-kind and in degree.  (*Id.* at 8–13.)  In other words, Mr. York appears to evaluate the value of the claimed technology at the time of infringement to assess what SANSI would have paid.  *See, e.g.*, *Brumfield, Tr. for Ascent Tr. v. IBG LLC*, 97 F.4th 854, 876 (Fed. Cir. 2024) ("[T]he incremental value to be allocated, in the hypothetical negotiation, is the value of the claimed technology (not, e.g., of unclaimed product improvements) over that of noninfringing alternatives.").  In that regard, his opinion is relevant and reliable and LDG may attack Mr. York's opinion through cross-examination.

Second, regarding unaccused products, LDG posits that Mr. York has failed to articulate how the products are acceptable substitutes.  (Doc. 107 at 18–19.)  LDG, however, imputes a requirement relevant to the lost profits inquiry, not reasonable royalties.  *See Salazar*, 2018 WL 2033709, at *3.  And in fact, Mr. York opined that a product available at the time of infringement offers substantially more heat dissipation than necessary, which SANSI could have adopted to achieve adequate thermal management without infringing on LDG's patented technology.  (Doc. 90-21 at 12–13.)  LDG's issue with Mr. York's opinion on this matter is for cross-examination, not summary judgement.

Third, LDG broad proclamation that the "law is clear" that "an infringing product by definition cannot be a non-infringing alternative."  *See Webasto,* 2019 WL 3334563, at *4 (noting "infringement and validity are presumed in a patent damages analysis, and it *should be* axiomatic that an infringing product by definition cannot be a non-infringing alternative" (emphasis in original)).  The law is not so clear as to provide a definitive bar.  A court in this district has concluded, although experts assume accused products are infringed on some level for damages, a jury may find accused products helpful to the

reasonable royalty analysis after finding them non-infringing. *See Nichia Corp. v. Feit Elec. Co., Inc.*, No. CV 20-359-GW-Ex, 2022 WL 17222250, at *9 (C.D. Cal. Oct. 12, 2022) (noting it is a factual matter within the jury's purview and appropriate for the jury to consider with the appropriate disclaimer that the accused products are relevant if the jury first finds them non-infringing). Mr. York opined that to the extend a jury finds the accused products non-infringing, SANSI then has an acceptable non-infringing alternative to adopt. (Doc. 90-21 at 15.) Excluding accused products as non-infringing alternatives at this juncture is premature. Thus, the Court will not grant LDG's Motion on this issue.

## IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Plaintiff Lighting Defense Group's Motion for Partial Summary Judgment (Doc. 98) is **granted in part** as to Defendants' written description, enablement, and indefiniteness defenses, and **denying it in part** on the availability of pre-suit damages and the non-infringing alternatives issue.

**IT IS FURTHER ORDERED** that Defendants Motion for Summary Judgment (Doc. 92) is **granted in part** and **denied in part** as to their anticipation defense and **granted in part** and **denied in part** on the availability of pre-suit damages.

Dated this 27th day of November, 2024.

Honorable Susan M. Brnovich
United States District Judge